Randall C. REYNOLDS, Appellant,

v.

STATE of Alaska, Appellee.

No. 6890.

Court of Appeals of Alaska.

June 10, 1983.

Robert B. Downes, Cole & Downes, Fairbanks, for appellant.

Kristen Young, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ., Judges.

## OPINION

SINGLETON, Judge.

Randall C. Reynolds was convicted of sexual assault in the first degree, AS 11.41.410, and acquitted of kidnapping, AS 11.41.300. He received a five-year sentence. He appeals challenging his conviction and contending that the sentence imposed was excessive. Reynolds challenges the constitutionality of AS 11.41.410, Alaska's first-degree sexual assault statute, and argues that he should have been given a directed verdict of acquittal on the kidnapping and sexual assault charges or, alternatively, more favorable jury instructions. We affirm.

Reynolds and J.D., his victim, were employees of separate businesses located in the Shoppers' Forum shopping mall in Fairbanks. On November 24, 1981, employees of the various businesses located in the mall were engaged in decorating it in anticipation of the Christmas shopping season. Reynolds and J.D. were acquainted but had never previously dated. J.D. accepted an invitation from Reynolds' father to join him, his girlfriend and Reynolds for dinner. The four went out to dinner and thereafter to a Fairbanks nightclub for drinks and dancing. J.D. allegedly asked Reynolds to take her home. Instead, he took her to his apartment. She alleges that he "forced" her to enter his apartment and used a key to close a deadbolt lock and pocketed the key, effectively preventing her from leaving. She contends that he had intercourse with her against her will and restrained her at the apartment until morning at which time he accepted her request to drive her home. She concedes that her objections were verbal, that she never forcibly resisted Reynolds and that Reynolds never threatened her or struck her. She contends that she was afraid of him particularly because she noticed a handgun on a chair in the room. She admits that Reynolds never touched or even mentioned the handgun. Reynolds testified that he had intercourse with J.D. with her consent. He contends that he did not notice anything about her behavior or demeanor which would indicate

that she did not wish to have intercourse with him. Reynolds' father and his father's girlfriend testified that during the early evening J.D. seemed comfortable in Reynolds' company and satisfied to be with him.

## CONSTITUTIONAL ARGUMENTS

Reynolds argues that AS 11.41.410 is unconstitutionally vague, chills constitutionally protected activity and, when applied to the facts of this case, results in the imposition of cruel and unusual punishment because the sanctions established are out of proportion to the seriousness of his conduct. *See* U.S. Const. amend. XIV, VIII. Alaska Const. art. 1, § 7, § 12. Essentially, Reynolds argues that the statute either requires strict liability regarding the putative victim's lack of consent or is so vague that reasonable people will disagree regarding the *mens rea* which the state must prove in order to obtain a conviction. He also contends that the statutory definitions make the offense so broad that it does not distinguish between serious and harmless conduct thereby depriving him of substantive due process.

In order to place Reynolds' arguments in context, it is necessary to briefly consider the history of our first-degree sexual assault statute. At common law, rape, the predecessor to first-degree sexual assault, required that the defendant have intercourse with a woman forcibly and against her will. *See* former AS 11.15.120. The phrase "forcibly and against her will" was interpreted to mean without her consent. Rape was a general intent crime. *Walker v. State,* 652 P.2d 88, 91 (Alaska 1982). The state was required to prove that the defendant intentionally engaged in the prohibited conduct, *i.e.,* sexual intercourse to which the complaining witness had not consented. However, it was not necessary for the state to prove that the defendant knew or should have known that the victim did not consent. The potential harshness of this rule was mitigated by the common law requirement that in order for the state to prove the absence of consent, it must show that the victim "resisted to the utmost." In

*State v. Risen,* 192 Or. 557, 235 P.2d 764 (Or.1951), the court interpreted a statute similar to our former rape statute and concluded:

> To constitute rape the act must have been committed forcibly and without the consent of the woman. The woman must resist by more than mere words. Her resistance must be reasonably proportionate to her strength and her opportunities. It must not be a mere pretended resistance but in good faith and continued to the extent of the woman's ability until the act has been consummated.

235 P.2d at 765 (citations omitted).

Illustrative of the operation of this rule is *Mills v. United States,* 164 U.S. 644, 17 S.Ct. 210, 41 L.Ed. 584 (1897). In that case, the defendant seized his victim at gunpoint, told her he was "Henry Starr," the notorious train robber, and threatened to kill her. He succeeded in having intercourse with her on two occasions. The trial court instructed the jury that:

> The fact is that all the force that need be exercised, if there be no consent, is the force incident to the commission of the act. If there is nonconsent of the woman, the force, I say, incident to the commission of the crime is all the force that is required to make out this element of the crime.

164 U.S. at 647, 17 S.Ct. at 210, 41 L.Ed. at 585. The defendant was convicted and appealed contending that the instruction erroneously stated the law. The United States Supreme Court agreed and reversed stating:

> In this charge we think the court did not explain fully enough so as to be understood by the jury what constitutes in law nonconsent on the part of the woman, and what is the force necessary in all cases of nonconsent to constitute the crime. He merely stated that if the woman did not give consent the only force necessary to constitute the crime in that case was that which was incident to the commission of the act itself. That is true in a case where the woman's will or her resistance had been overcome by

threats or fright, or she had become helpless or unconscious, so that while not consenting she still did not resist. But the charge in question covered much more extensive ground. It covered the case where no threats were made; where no active resistance was overcome; where the woman was not unconscious, but where there was simply nonconsent on her part and no real resistance whatever. Such nonconsent as that is no more than a mere lack of acquiescence, and is not enough to constitute the crime of rape. Taking all the evidence in the case, the jury might have inferred just that amount of nonconsent in this case. Not that they were bound to do so, but the question was one for them to decide. The mere nonconsent of a female to intercourse where she is in possession of her natural, mental, and physical powers, is not overcome by numbers or terrified by threats, or in such place and position that resistance would be useless, does not constitute the crime of rape on the part of the man who has connection with her under such circumstances. More force is necessary when that is the character of nonconsent than was stated by the court to be necessary to make out the element of the crime. That kind of nonconsent is not enough, nor is the force spoken of then sufficient, which is only incidental to the act itself .... where a woman is awake, of mature years, of sound mind and not in fear, a failure to *oppose* the carnal act is consent; and though she object verbally, if she make no outcry and no resistance, she by her conduct consents, and the act is not rape in the man.

164 U.S. at 647–48, 17 S.Ct. at 210–11, 41 L.Ed. at 585.

More recent cases have substantially diluted the requirement of "resistance to the utmost," increasing the risk that a jury might convict a defendant under circumstances where lack of consent was ambiguous. To counteract this risk, some courts, notably the Supreme Court of California, have held that the defendant is entitled to an instruction on reasonable mistake of fact. *See People v. Mayberry,* 15 Cal.3d 143, 125 Cal.Rptr. 1337, 542 P.2d 1337 (Cal. 1975). The California instruction reads as follows:

It is a defense to a charge of forcible rape that the defendant entertained a reasonable and good faith belief that the female person voluntarily consented to engage in sexual intercourse. If from all the evidence you have a reasonable doubt whether the defendant reasonably and in good faith believed she voluntarily consented to engage in sexual intercourse, you must give the defendant the benefit of that doubt and acquit him of said charge.

California Jury Instructions-Criminal Instruction No. 10.23 (4th ed. 1979).

Under *People v. Mayberry,* when a defendant argues "consent" as a defense, the state must prove that he intentionally engaged in intercourse and was at least negligent regarding his victim's lack of consent.

Alaska has dispensed with any requirement that the victim resist at all. AS 11.-41.470 provides in relevant part:

*Definitions.* For purposes of §§ 410–470 of this chapter [sexual offenses], unless the context requires otherwise,

(3) "without consent" means that a person

(A) with or without resisting, is coerced by the use of force against a person or property, or by the express or implied threat of imminent death, imminent physical injury, or imminent kidnapping to be inflicted on anyone;

The code defines "force" and "physical injury" as follows:

AS 11.81.900(b)(22) "force" means any bodily impact, restraint, or confinement or the threat of imminent bodily impact, restraint, or confinement; "force" includes deadly and nondeadly force;

AS 11.81.900(b)(40) "physical injury" means physical pain or an impairment of physical condition;

Thus, the legislature has substantially enhanced the risk of conviction in ambiguous circumstances by eliminating the requirement that the state prove "resistance" and

by substantially broadening the definitions of "force" and "physical injury."[1] We are satisfied, however, that the legislature counteracted this risk through its treatment of *mens rea*. It did this by shifting the focus of the jury's attention from the victim's resistance or actions to the defendant's understanding of the totality of the circumstances. Lack of consent is a "surrounding circumstance" which under the Revised Code, requires a complementary mental state as well as conduct to constitute a crime. *See Neitzel v. State,* 655 P.2d 325, 329 (Alaska App.1982). No specific mental state is mentioned in AS 11.41.410(a)(1) governing the surrounding circumstance of "consent." Therefore, the state must prove that the defendant acted "recklessly" regarding his putative victim's lack of consent. *Id.* at 334. This requirement serves to protect the defendant against conviction for first-degree sexual assault where the circumstances regarding consent are ambiguous at the time he has intercourse with the complaining witness. While the legislature has substantially reduced the state's burden of proof regarding the *actus reus* of the offense, it has at the same time made it easier for the defendant to argue the defense of mistake of fact. The Alaska rule is more favorable to Reynolds than the rule of *People v. Mayberry.* This follows from the distinction the code draws between negligence and recklessness. The senate committee suggested:

> When a statute in the code provides that a person must recklessly cause a result or disregard a circumstance, criminal liability will result if the defendant "is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists." The test for recklessness is a subjective one—the defendant must actu-

ally be aware of the risk. On the other hand, if criminal negligence is the applicable culpable mental state, the defendant will be criminally liable if he "fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists." The test for criminal negligence is an objective one—the defendant's culpability stems from his failure to perceive the risk.

2 Senate Journal 142 (1978). *See also* Tentative Draft Part 11, 12–19.

■ In order to prove a violation of AS 11.41.410(a)(1), the state must prove that the defendant knowingly engaged in sexual intercourse and recklessly disregarded his victim's lack of consent. Construed in this way, the statute does not punish harmless conduct and is neither vague nor overbroad. We therefore reject Reynolds' constitutional attack on AS 11.41.410 in general. We will consider his constitutional attack on the statute as it was applied to him hereafter.

## SUFFICIENCY OF THE EVIDENCE

Having construed the statute, we are now prepared to consider Reynolds' other arguments. First, he contends that there was insufficient evidence to establish that he kidnapped J.D.[2] or committed first-degree sexual assault against her.

AS 11.41.300 provides in relevant part: *Kidnapping.* (A) A person commits the crime of kidnapping if

(1) he restrains another person with intent to

(c) . . . sexually assault him . . . ;

AS 11.41.410 provides in relevant part:

*Sexual assault in the first degree.* (a) A person commits the crime of sexual assault in the first degree if,

---

1. The Alaska Revised Code provisions defining sexual offenses are based on a proposed Michigan Code. *See* Alaska Criminal Code Revision, Part I at 99. The Michigan Code is discussed and criticized in Model Penal Code and Commentaries, Part II, § 213.1, at 289 (1980) and see Note *Recent Statutory Developments In The Definition Of Forcible Rape,* 61 Va.L.Rev. 1500 (1975).

2. While the jury acquitted Reynolds of kidnapping, he contends that permitting the jury to consider it enabled the jury to compromise, enhancing the risk that he would be unjustly convicted of sexual assault.

(1) being any age, he engages in sexual penetration with another person without consent of that person;

AS 11.41.470(3)(A) provides in relevant part:

(3) "without consent" means that a person

(A) with or without resistance, is coerced by the use of force against a person or property, or by the express or implied threat of imminent death, imminent physical injury, or imminent kidnapping to be inflicted on anyone . . . ;

■ Reynolds testified and conceded that he had sexual intercourse with J.D., *i.e.,* that he sexually penetrated her. Since "force" includes "restraint," his guilt of kidnapping and first-degree sexual assault turns on whether he "restrained her" with intent to have sexual intercourse and whether he recklessly disregarded her lack of consent.

In reviewing the denial of a judgment of acquittal, we apply the following test:

[T]his court must consider the evidence and the reasonable inferences arising therefrom in the light most favorable to the state and determine if fair-minded jurors in the exercise of reasonable judgment could differ on the question of whether guilt has been established beyond a reasonable doubt. If the jurors could so differ, then the case was properly submitted to the jury.

*Elson v. State,* 633 P.2d 292, 298 (Alaska App.1981), *aff'd* 659 P.2d 1195 (Alaska 1983).

■ We have carefully reviewed the record and conclude that reasonable people could differ as to the existence of the elements of "restraint" and "reckless disregard of lack of consent." J.D. testified that after they left the Feed and Fuel, a Fairbanks bar where she, the defendant, Reynolds, Reynolds' father and Reynolds' father's girlfriend had gone after dinner, she told Reynolds she wanted to go home. He refused to take her home and said they were going to visit a friend of his. She again stated that she wanted to go home, but he ignored her. They stopped in front of an apartment complex and Reynolds tried to talk J.D. into going inside. When she refused, he grabbed her wrist and pulled her out of the car. J.D. became frightened and again told Reynolds she wanted to go home. Reynolds ignored her and began pulling her down the sidewalk toward the building. As she was being pulled down the sidewalk, J.D. repeatedly told Reynolds she wanted to go home. J.D. testified that Reynolds pushed her into what turned out to be his apartment and locked the door with a key. The deadbolt on the door was key-operated and Reynolds put the key in his pants pocket. She therefore could not leave without his assistance. Once they were inside the apartment, Reynolds suggested that they sit down on the couch and talk. J.D. again told Reynolds she wanted to go home and he replied he would take her home soon. After they had been conversing for about fifteen minutes, Reynolds stated he wanted to give J.D. a tour of his apartment. She replied that she did not want a tour. At that point, Reynolds pulled J.D. off the couch and insisted on showing her the apartment. After the tour, Reynolds suggested they go back to the couch. After they had been sitting on the couch for a few minutes, Reynolds suddenly grabbed both of J.D.'s writs, pulled them over her head and forced her to lie down on the couch. J.D. told Reynolds she wanted to go home and attempted to get away from him. Reynolds acted like he did not hear her and began kissing her. J.D. testified that she repeatedly told Reynolds she "didn't want him to do anything" but he persisted. Reynolds then picked J.D. up and carried her into his bedroom. She tried to get away but was not able to. As she was being carried into the bedroom, J.D. repeatedly asked Reynolds to put her down. J.D. testified that she was trying to talk very softly because Reynolds was acting very strange and she did not want to upset him.

After Reynolds carried J.D. into the bedroom, he threw her on the bed, and forcibly pulled off her boots, pantyhose, and underpants, slightly ripping her pantyhose in the

process. At this point, J.D. noticed a handgun lying on a chair near the bed. J.D. testified that the gun "scared [her] to death" and that she was very afraid that Reynolds might use the gun. She concedes Reynolds never touched or mentioned the gun. Reynolds told J.D. to unhook her dress and she did so because she was very frightened. J.D. told Reynolds that she did not want to have sexual intercourse. Reynolds replied that he knew she wanted it, so why didn't she just admit it. Reynolds then had sexual intercourse with J.D. During intercourse Reynolds continued to ask J.D. if she "wanted it" until she said that she did. J.D. testified that she answered in the affirmative because "there was really nothing I could do at that point, other than agree with him, and hope everything would turn out all right, and I was just too scared of him to argue at all." J.D. testified that Reynolds complained that she was not enjoying it, and so out of fear she simulated a physical response. Reynolds also told J.D. that he had "planned" the entire incident in advance and that he had always wanted to "fuck a model." J.D. was the assistant manager of a modeling agency at the time. J.D. testified that she was sure she communicated her lack of consent and that Reynolds understood her. She further testified that she did not offer more physical resistance because she was afraid Reynolds would injure her. After the assault, J.D. asked Reynolds to take her home; he replied that he take her home in the morning. The next morning Reynolds would not take J.D. home until she promised to come back to his apartment that night and "spread her legs." J.D. made a prompt complaint to her roommate, T.R., upon arriving home and later that day contacted the police. While Reynolds never expressly threatened J.D., did not use a dangerous weapon or cause her serious physical injury, her testimony, if believed, establishes that he restrained her by locking his door with a key and pocketing the key, and physically preventing her from fleeing. The evidence, if believed, would also establish that he used force, *i.e.,* physical impact on her, and caused her some physical injury, *i.e.,* physical pain. Further, his statement to her that he had planned the entire incident would support an inference that his restraint and use of force was with the intent to have intercourse. Finally, J.D.'s objections and other actions and Reynolds' statements to J.D. and his actions with regard to her, viewed in their totality, would support an inference that he had a subjective awareness of a substantial risk that J.D. did not wish to have intercourse with him and recklessly disregarded that risk. The trial court therefore did not err in denying Reynolds' respective motions for judgment of acquittal on the charges of kidnapping and first-degree sexual assault.

## JURY INSTRUCTIONS

Reynolds argues that the trial court incorrectly instructed the jury. He points out that the jury was not expressly told that it had to find that he "recklessly" disregarded J.D.'s lack of consent before it could convict him of first-degree sexual assault. He concedes that he did not object to the instructions on first-degree sexual assault and therefore must establish plain error to be heard on appeal. *See Walker v. State,* 652 P.2d 88, 92 n. 7 (Alaska 1982) (not plain error to fail to give instruction governing mistake of fact regarding victim's consent under prior rape law).

The jury was instructed as follows regarding first-degree sexual assault:

A person commits the crime of sexual assault in the first degree if he engages in sexual penetration with another person without the consent of that person.

In order to establish the crime of sexual assault in the first degree, it is necessary for the state to prove beyond a reasonable doubt the following:

First, that the event in question occurred at or near Fairbanks, in the Fourth Judicial District, State of Alaska, and on or about the 25th day of November, 1981;

Second, that RANDALL REYNOLDS engaged in sexual penetration with [J.D.]; and,

Third, that the penetration occurred without the consent of [J.D.].

While Reynolds is correct that the foregoing instructions standing alone might be interpreted as establishing strict liability regarding J.D.'s lack of consent, any such risk disappears when we examine the other instructions. For example, the jury was told:

In the crimes charged in the indictment there must exist a joint operation of an act or conduct and a culpable mental state. To constitute a culpable mental state is not necessary that there exist an intent to violate the law. When a person knowingly does that which the law declares to be a crime, he is acting with a culpable mental state, even though he may not know that his act or conduct is unlawful.

Significantly, the jury was given the following definition of the term "knowingly":

A person acts "knowingly" with respect to conduct or to a circumstance described by the law when he is aware that his conduct is of that nature or that the circumstance exists. When knowledge of the existence of a particular fact must be proved by the state, that knowledge is established if a person is aware of a substantial probability of the existence of that fact, unless he actually believes that it does not exist.

█ In conclusion, the jury was told that, before Reynolds could be convicted of first-degree sexual assault, it had to find beyond a reasonable doubt that he knowingly did an act which the law forbids, i.e., knowingly had sexual intercourse with J.D., knowing that she did not consent. Furthermore, it is clear that Reynolds and his counsel understood that this was the burden the state had to meet. In his opening statement and his final argument, defense counsel argued that Reynolds had no reason to believe that J.D. did not want to have intercourse because she never expressed her lack of consent. In rebuttal, the prosecutor conceded that J.D. needed to communicate her nonconsent in some way to Reynolds before he could be guilty of first-degree sexual assault and that it was up to the jury to decide whether J.D. had, in fact, communi-

cated her lack of consent to Reynolds. During the trial, direct and cross-examinations of both J.D. and Reynolds focused on whether J.D. had communicated her lack of consent. On direct examination, J.D. testified that she told Reynolds several times that she wanted to go home and she did not want to kiss him or have sexual intercourse. On cross-examination, J.D. stated that she was sure that she told Reynolds she did not want to have intercourse and that he understood her. Reynolds testified that J.D. didn't say much and that she never gave him any reason to believe the incident occurred without her consent.

Under these circumstances, we are satisfied that the trial court did not commit plain error in failing to specifically instruct the jury that Reynolds had to recklessly disregard a substantial risk that J.D. did not consent to intercourse before he could be convicted of first-degree sexual assault.

## SENTENCING

Reynolds contends that, by eliminating a requirement of "utmost resistance" and defining "force" as any unprivileged touching of a putative victim, so that his conduct qualifies as first-degree sexual assault, the legislature subjected him to cruel and unusual punishment in violation of the eighth amendment to the United States Constitution and deprived him of substantive due process and the equal protection of the laws in violation of the fourteenth amendment of the United States Constitution. While he does not specifically mention the comparable provisions of our state constitution, we assume he seeks relief under them as well. Essentially, Reynolds argues that the legislature has irrationally grouped under a single statute, subject to a single range of punishments, such substantially diverse conduct as a brutal parking lot assault on a total stranger, resulting in permanent injuries, on the one hand, and the minor imposition of an overly amorous social friend, on the other, so as to irrationally fail to distinguish between minor harm and major injury.

We recognize that the Alaska Statutes are in part based upon a series of state code revisions which in turn are based upon the Model Penal Code. We also realize that the Model Penal Code differentiates between degrees of rape depending upon whether the victim or another suffers serious physical injury or, alternatively, was not a previous social companion of the defendant. *See, e.g.,* Model Penal Code § 213.1. To a certain extent, J.D. was a "voluntary social companion of [Reynolds]" and did not suffer serious physical injury. *Cf.* N.Y.Penal Code § 130.35, § 130.00(8) (requires "forcible compulsion" for first-degree rape and defines forcible compulsion as "physical force that overcomes earnest resistance; or a threat, expressed or implied, that places a person in fear of immediate death or serious physical injury to himself or another person, or in fear that he or another person will immediately be kidnapped.")

■ We are satisfied, however, that the Revised Code cannot be viewed in isolation but must be construed along with the sentencing provisions of the new code which were enacted at the same time. *See* AS 12.55.005–185. Thus, at the time Reynolds was tried, possession or use of a firearm or serious physical injury to the victim were aggravating factors mandating a six-year presumptive term. AS 12.55.125(c)(1). In past decisions we have suggested that in the absence of this aggravating factor, a first offender should receive a substantially less severe sentence. We note that Reynolds received a five-year sentence. By the same token, AS 12.55.155 sets out a number of aggravating factors which the trial court should consider in determining an appropriate sentence. While these factors are not, strictly speaking, applicable to a first offender, we have indicated that the six-year presumptive term should not be exceeded unless the trial court finds one or more aggravating factors or extraordinary circumstances. When we construe the Revised Code and the concurrent amendments governing sentences together, we are satisfied that the legislature has not irrationally failed to distinguish between degrees of culpability and that the penalty provisions

of the sexual offenses provisions of the Revised Code did not subject Reynolds to cruel and unusual punishment or deny him substantive due process or the equal protection of the laws.

Finally, Reynolds contends that the sentence imposed was excessive. He points out that he is a first offender, that he did not use a dangerous weapon, that J.D. did not suffer physical injury and that his actions were not otherwise egregious. He contends therefore that a five-year sentence of imprisonment is excessive. *See Ahvik v. State,* 613 P.2d 1252 (Alaska 1980). In *Ahvik,* the defendant, age eighteen, raped his fifteen-year-old niece. He received a sentence of five years' imprisonment. On appeal, the supreme court held the sentence excessive and reversed for entry of a sentence not to exceed five years with two years suspended. In reaching its conclusion, the supreme court stressed that Ahvik had not assaulted a stranger, the victim suffered no serious physical injury, the assault was not sufficiently brutal to cause severe psychological or physical after-effects, that Ahvik was only eighteen and accepted responsibility for his crime and that his prognosis for rehabilitation was good. The supreme court concluded:

> We do not believe Ahvik should be placed with hardened criminals, as this is likely to reinforce any criminal tendencies he may already have. We believe that the sentence should include a recommendation that Ahvik be placed in a facility such as the Palmer Correctional Center, where there is an emphasis on rehabilitation programs. The classification requirements issued by the Alaska Department of Health and Social Services, Division of Corrections, for placement in the Palmer facility specify: "Due to the uniqueness of the facility, prisoners must be within three years of their mandatory release date." Our conclusion is that Ahvik should not receive a sentence of more than five years with two suspended.

613 P.2d at 1254 (footnote omitted).

■ Reynolds was twenty-three years old at the time of the offense. His victim, J.D.,

was a mature woman of twenty-one. She was not a stranger. He did not threaten her with a dangerous weapon or cause her severe personal injuries. Stephen Korenek, an adult probation officer, prepared the presentence report. He interviewed Reynolds and J.D. He noted that Reynolds was a first offender and that Reynolds had completed his education and been trained and steadily employed as a cosmetologist. He considered Reynolds' assault on J.D. the minimum which would qualify as first-degree sexual assault under current law and recommended a sentence of five years with four and one-half years suspended. He did note, however, three negative factors: first, that Reynolds would not acknowledge that J.D. had not agreed to have intercourse with him; second, that Reynolds had a prior incident in which he and his father took two seventeen-year-old girls to Reynolds' apartment and Reynolds (Jr.) carressed and fondled one of the girls without her permission; and third, that Reynolds seemed to have planned his assault on J.D.

Reynolds argues that on balance, his case is indistinguishable from *Ahvik* so that he should receive a sentence of no more than three years. A number of factors, however, serve to distinguish this case from *Ahvik* and support the trial court's decision. First, the legislature has substantially amended sexual offense statutes in the interim since *Ahvik* was decided. Uniformly, the penalties have been increased. The current presumptive sentence for one who does not use a dangerous weapon or cause serious physical injury is eight years. AS 12.-55.125(i)(1). Where serious injuries are suffered or a dangerous weapon is used the presumptive term for a first offender is ten years. AS 12.55.125(i)(2). While these amendments were not in force at the time Reynolds committed his crimes, they provide some indication of current legislative views regarding the relative seriousness of the offense and weaken, somewhat, Ahvik's continuing authority. *See Whittlesey v. State,* 626 P.2d 1066, 1068 (Alaska 1980).

Second, the trial court rejected the probation officer's recommendation of a minimum sentence and found three aggravating factors which were not present in *Ahvik:* (1) that Reynolds left a handgun in prominent view in his bedroom, intimidating the victim;[3] (2) that Reynolds locked her in, and (3) that his conduct caused her substantial emotional suffering. In light of these factors a total sentence of five years' imprisonment was not clearly mistaken.

The judgment of the superior court is AFFIRMED.

---

3. The trial court found the presence of the handgun near the bed suspicious, and implicitly found that Reynolds should have known that it

would intimidate J.D. Judge Blair did not find that Reynolds intentionally relied on the gun to intimidate her.