**Thomas LASETER, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 7736.**

Court of Appeals of Alaska.

June 29, 1984.

---

Mary E. Greene, Asst. Public Defender, Fairbanks, and Dana Fabe, Public Defender, Anchorage, for appellant.

Richard W. Maki, and Cynthia M. Hora, Asst. Attys. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Thomas Laseter was convicted, following a jury trial, of attempted sexual assault in the first degree and kidnapping. AS 11.-41.410(a)(1); and AS 11.31.100(a); and AS 11.41.300(a)(1)(C). He appeals his convictions to this court, raising several specifications of error. We conclude that the trial judge improperly instructed the jury and reverse Laseter's convictions.

On April 18, 1982, Thomas J. Laseter, a twenty-one-year-old career soldier stationed at Ft. Wainwright, went to the French Quarter, a local bar, where he met L.P. Because their accounts as to what happened differ significantly, they are given separately.

### L.P.'s Account

Shortly before midnight L.P. went to the French Quarter to have a few drinks and to see a girlfriend who worked there. L.P. drank a few beers and played several games of pool with her friend. Laseter came in, joined them at the pool table, and played a game of pool with L.P. Laseter asked L.P. several times if she wanted to go somewhere else to have a drink with him, but she refused. When the French Quarter closed at 2:00 a.m., L.P. decided to walk over to the Stampede, another bar. Shortly after she arrived there, Laseter walked in and sat down next to L.P. at the bar. Laseter bought L.P. several beers. They sat and talked until about 5:00 a.m. L.P. left the bar, intending to go to the Northward Building where she planned to spend the night in a friend's apartment. Although Laseter offered to drive her home several times that evening, she did not accept. L.P. saw Laseter again as he was driving out of the Stampede's parking lot. He stopped and asked if she was sure she did not want a ride home. This time L.P. accepted. After she got in the car Laseter asked for directions to her home. She gave him complete directions. Due to the amount of alcohol she had consumed, L.P. blacked out at this point. However, she remembers telling Laseter that they

were going in the wrong direction. Laseter said he would turn around.

The next thing L.P. remembered was being in Hamilton Acres by the D & L Bike Shop. She told Laseter he was going the wrong way but Laseter kept on going. L.P. became scared and told him to either turn around or stop the car so she could get out. Laseter kept on driving. At one point, when Laseter was stopped at a stop sign, L.P. tried to get out of the car. Laseter grabbed her arm and hair and pulled her back into the car. He told her she was not going anywhere. L.P. started to cry. She was so frightened that she blacked out again.

L.P. next remembered "being slapped, punched around, having her hair pulled." Laseter was muttering that since he had bought her some beer and offered her a ride home she owed it to him to go to bed with him. She told him "no way." Laseter got upset and began to hit her with his hand and with what she thought was a bottle. L.P. started to scream and yell. Laseter pushed her down onto the front seat of the car. Although she tried to fight her way back up and get out of the car, Laseter forced her to engage in fellatio. He then pulled down her pants and had intercourse with her for a few minutes. He then attempted unsuccessfully to put his penis in her rectum. L.P. did not know whether Laseter ever ejaculated. He then got up off her and she "scrambled" out of the car. L.P. ran to a nearby apartment building. The outside door was locked so she started beating on it. A woman answered and let her in when she asked for help. The next thing L.P. remembered was being examined by a doctor at the hospital.

### Laseter's Account

After Laseter arrived at the French Quarter, he had a few beers and watched L.P. and the bartender play pool. After they finished, Laseter started to play. He played one game of pool with L.P. and bought her four or five drinks. When Laseter first asked L.P. if she wanted to go someplace else she refused; later she went with him to the Stampede.

Laseter and L.P. stayed at the Stampede for about an hour. Laseter bought L.P. a screwdriver. They sat and listened to the jukebox until the bartender turned it off. Then they went next door to the Arctic Bar where they stayed until 4:00 or 4:30 a.m. Laseter told L.P. that he had to leave so that he could take her home and still be back at the base in time to get ready for field exercises. L.P. did not want to leave so they danced a couple of times and finished their drinks. L.P. had three or four screwdrivers at the Arctic Bar. Laseter had between ten and fifteen beers that evening. Laseter finally got up, told L.P. that he was going to leave, and asked her if she wanted a ride. L.P. did not say anything, so Laseter walked out the door. As he turned around to unlock the car, he saw L.P. walking up to the passenger door. Laseter asked her if she wanted a ride, and she said yes.

Laseter asked L.P. for directions to her home. Laseter did not know the Fairbanks streets very well because he had only had an operable car since February and did not spend much time downtown. L.P. gave Laseter directions, but he told her she would have to guide him step by step. However, L.P. either fell asleep or passed out. Although Laseter tried to follow her directions, he got lost. L.P. lived on Goldstream Road but Laseter ended up in Hamilton Acres. Laseter tried to wake L.P. up. He reached over and was shaking her when he hit some ice and drove into a fence.

Laseter then drove around trying to find the way to L.P.'s home. L.P. still seemed to be asleep or passed out. While he was trying to figure out where he was, Laseter got stuck in a breakup puddle in an alley near the D & L Bike Shop. After trying for about fifteen or twenty minutes to get out, Laseter asked Bill Hoople, who was arriving for work at a nearby office, to help him. Hoople was unable to help Laseter but suggested that he wait until someone else got there.

Laseter then went back to the car to wake L.P. and tell her that they were stuck. L.P. did not say anything, but just

sat up and looked around. Laseter testified that he sat there for a few minutes, then leaned over and kissed her. She responded and kissed him back. He continued to kiss her and then started kissing her breast. L.P. did not say anything but seemed to be enjoying it. When Laseter asked her if she wanted to get in the back seat, L.P. did so. Laseter continued to kiss her and then started to remove her clothing. As Laseter was pulling down his own pants, he prematurely ejaculated on the side of L.P.'s leg and on the back seat. Embarrassed, Laseter pulled his pants back up and got out of the car. As he was dressing, L.P. moved her hand up over her face. Nothing was said.

Laseter went back across the street where he found someone with a tow rope who agreed to pull him out of the puddle. When Laseter got back to the car, L.P. was gone. He looked around but he did not see her. The police arrived as Laseter was hooking up the tow strap to his car.

### Jury Instructions

 This court has held that "[i]n order to prove a violation of AS 11.41.410(a)(1) [sexual assault in the first degree], the state must prove that the defendant knowingly engaged in sexual intercourse and *recklessly disregarded his victim's lack of consent." Reynolds v. State,* 664 P.2d 621, 625 (Alaska App.1983) (emphasis added). The issue before this court is whether the trial court committed reversible error when it refused to instruct the jury on subjective awareness of nonconsent as an element of sexual assault in the first degree. The accuracy of the instruction on sexual assault in the first degree affects

both Laseter's conviction for attempted sexual assault in the first degree and his conviction for kidnapping.[1]

Prior to trial, Laseter proposed two instructions which read:

"Without Consent." In order to find the defendant guilty of sexual assault in the first degree, you must find that he was subjectively aware that [L.P.] did not consent to sexual penetration. If from all the evidence you have a reasonable doubt as to the question whether the defendant believed that [L.P.] consented to sexual penetration, you must give the defendant the benefit of that doubt and find him not guilty.

"Recklessly." With respect to the circumstance of consent, a person acts recklessly with respect to a circumstance described by the law when he is aware of and consciously disregards a substantial and unjustifiable risk that the circumstance exists. The risk must be of such a nature and such a degree that disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who is unaware of a risk of which he would have been aware had he not been intoxicated acts recklessly with respect to that risk.

The state objected to both instructions, and the court did not give them. In their place, the court substituted the following instruction as to "reasonable belief."[2]

If from all the evidence you find that the defendant had a reasonable belief that L.P. consented to sexual penetration, you shall find the defendant not

---

1. Laseter was convicted of kidnapping under the provisions of former AS 11.41.300(a)(1)(C), which provided in pertinent part:

 *Kidnapping.* (a) A person commits the crime of kidnapping if
 (1) he restrains another person with intent to
 . . . .
 (C) inflict physical injury upon him or *sexually assault* or place him or a third person in apprehension that any person will be subjected to serious physical injury or sexual assault. [Emphasis added.]

Thus, the instructions which defined what actions constituted a sexual assault were critical to the definition of kidnapping.

2. As Laseter notes, this instruction is similar to the "reasonable belief" instruction approved in *People v. Mayberry,* 15 Cal.3d 143, 125 Cal.Rptr. 745, 542 P.2d 1337, 1344–46 (Cal.1975), and reviewed by this court in *Reynolds v. State,* 664 P.2d 621, 624 (Alaska App.1983). This court concluded that the Alaska Code requires the state to demonstrate greater culpability in a first-degree sexual assault case than is required by this instruction. *Id.* at 625.

guilty as to the crime of sexual assault in the first degree. If the defendant's belief as to L.P.'s consent was induced by his state of intoxication, you shall find it is not a reasonable belief.

It is clear that the instruction which the trial court gave is erroneous in light of *Reynolds*.[3] The state points, however, to other instructions which the trial court gave which the state argues effectively "over-instructed" the jury by requiring the jury to find that Laseter did in fact "know" that L.P. did not consent to sexual penetration.[4] Looking at the instructions in their entirety, we believe that there is at least a substantial likelihood that if the jurors thought that the case turned on whether Laseter either negligently or recklessly disregarded whether L.P. consented to sexual penetration, the jury would follow the instruction which specifically dealt with consent. Since that instruction was erroneous, we do not find harmless error.

The state also contends that the erroneous instruction was harmless in light of the evidence at trial. Essentially, the state argues that if the jury believed the alleged victim, L.P., then Laseter clearly had forcible intercourse with her; if the jury believed Laseter, then L.P. consented to intercourse. We have reviewed the record and do not see the case as that clear-cut. L.P. testified that Laseter definitely sexually penetrated her, yet the jury acquitted Laseter of first-degree sexual assault. The jury must have had a reasonable doubt as to whether Laseter achieved penetration. Testimony was presented at trial which indicated that L.P. was intoxicated to the point where she had multiple black-outs. We note that the prosecutor cross-examined Laseter on whether it ever occurred to him that L.P. might not be capable, because of intoxication, of being able to communicate that she did not want to have intercourse. Given the facts of this case, we believe that the jury could have convicted Laseter if it found that Laseter subjectively believed that L.P. consented to intercourse but that his subjective belief was unreasonable. Had the jury been instructed that Laseter could only be convicted if he was reckless in his belief that L.P. consented, the jury might have reached a different verdict. We therefore cannot conclude that the erroneous jury instruction was not harmless, and we reverse Laseter's convictions.[5]

The convictions are REVERSED.

**3.** The trial judge did not have the benefit of the *Reynolds* decision because that case was decided after Laseter's case was tried. We note that the defendant's proposed instruction defining "without consent" was incorrect since it required actual knowledge that the victim did not consent to penetration. As we held in *Reynolds,* the correct standard is whether the defendant recklessly disregarded the victim's lack of consent. However, we conclude that the defendant's proposed instruction adequately brought the issue of the mental state for lack of consent to the trial court's attention. *See Zarate v. People,* 429 P.2d 309, 312–13 (Colo.1967) (where proposed instruction is defective but raises an essential and critical issue not otherwise covered, the court, in cooperation with counsel, should either rewrite the proposed instruction or incorporate its substance into another instruction). *See also Pepsi Cola Co. v. Superior Burner Serv. Co.,* 427 P.2d 833, 837 (Alaska 1967).

**4.** The state points to instructions similar to ones which we relied upon in affirming the conviction in *Reynolds,* 664 P.2d at 627–28. However, *Reynolds* is distinguishable on a number of grounds. First, *Reynolds* was a plain error case. Second, *Reynolds* did not involve an erroneous instruction specifically addressing the requisite *mens rea* with regard to the victim's consent. Third, in *Reynolds* we relied on the arguments which the parties had made to the jury in deciding that the jury had properly been informed of the requisite *mens rea. Id.* at 628.

**5.** Laseter argues that the trial judge erred in instructing on attempted sexual assault in the first degree. Laseter argues that there was no evidence to support an instruction on this lesser-included offense. We believe that a jury looking at the facts of this case could find that Laseter attempted to sexually assault L.P. but did not actually succeed in penetrating her. This conclusion is supported by Laseter's testimony that he attempted to have intercourse with L.P. but prematurely ejaculated and the expert testimony that no sperm was found in L.P.'s vagina. We find that there was sufficient evidence to support this lesser-included instruction. In light of our reversal of his convictions, we do not believe that it is necessary for us to reach the other issues which Laseter has raised in this appeal.