Patrick PLETNIKOFF, Appellant,

v.

STATE of Alaska, Appellee.

No. A–394.

Court of Appeals of Alaska.

May 30, 1986.

William B. Oberly, Gorton & Oberly, Anchorage, for appellant.

Cynthia M. Hora, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Ronald W. Lorensen, Acting Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

SINGLETON, Judge.

Patrick Pletnikoff was convicted by a jury of two counts of sexual assault in the first degree, an unclassified felony, AS 11.-41.410(a)(1). S.J. was his alleged victim. Pletnikoff's appeal rests on two argu-ments. First, that the trial court erred in permitting the jury to consider the testimony of A.E., S.J.'s roommate, regarding an unrelated sexual encounter with the defendant approximately one week before the incident in question. And, second, that the trial court erred in failing to find ineffective assistance of counsel, where trial counsel failed to object to jury instructions that did not include a defense that the defendant had a good faith, though unreasonable belief, that the victim had consented.

The state concedes error in both respects, and we find that the concessions are supported by the record. *See Marks v. State*, 496 P.2d 66, 67–68 (Alaska 1972). The state, nevertheless, argues that any error in admitting the testimony of A.E. was harmless, and that any prejudice flowing from the failure to properly instruct the jury does not meet the test of plain error or establish ineffective assistance of counsel. Having reviewed the record, we conclude that the cumulative effect of these conceded errors served to deny Pletnikoff a fair trial. We therefore reverse and remand for a new trial.

Patrick Pletnikoff met S.J. and A.E. at White Mountain Realty, where the two women were employed. A former state trooper employee in charge of prisoner transport, Pletnikoff was exploring a possible business partnership with the two women's employer, Douglas Bell. Pletnikoff and Bell planned to market modular housing in the western villages of Alaska.

Approximately one week before the alleged assaults on S.J., Pletnikoff met A.E. and S.J. for drinks at a local restaurant. S.J. eventually left, but A.E. and Pletnikoff remained and discussed A.E.'s desires for more interesting employment in Alaska's "bush." Pletnikoff indicated that "political pull" was needed to obtain such employment and that he could help A.E. in that regard. A.E. told Pletnikoff that she recently lost a child and was looking for employment in a small town. He asked her how much money she would need, and she replied approximately $55,000 per year. He indicated that he could find that kind of

position for her in the Pribolof Islands or somewhere else where he had connections.

A.E. indicated that she drank substantially more than she normally did, and decided she had better go home. Pletnikoff told her that his car was not parked near the restaurant and that he needed a ride. She agreed, and Pletnikoff told her he would direct her to his vehicle. Instead he directed her to another bar, and she reluctantly went inside with him and had a Seven-Up. Ultimately, he told her his car was at her real estate office and she took him there, arriving at approximately 1:00 a.m. It appears that Pletnikoff's vehicle was not there. Once there, Pletnikoff allegedly asked her to unlock the door, and she did, thinking he had left his coat inside. They entered, and he leaned his back against the door and said, "I didn't think I'd get you this far." And she responded, "I don't believe it either.... I don't do this kind of thing." Then he said, "Let's fuck and have some fun." A.E. testified that she had not wanted to have sexual relations with Mr. Pletnikoff and stated, "He took my clothes off, he dropped his own clothes. I just had a funny feeling in the pit of my stomach that there was no getting out that door."

A.E. did not indicate in her testimony, however, that she ever verbalized an unwillingness to have intercourse with Pletnikoff or gave other objective manifestations of her nonconsent. She did not mention her experience to S.J., her roommate, or inform the police until five months after the incident occurred, three months after charges had been pressed against Pletnikoff by S.J., because she felt she had "gotten [herself] in a corner."

Approximately one week after the incident with A.E., Pletnikoff called S.J. and asked her to join him and two others for a business dinner, telling her that they would be discussing contracts for native housing and that there might be some future gain for her. S.J. assented and joined the party for dinner. S.J. testified that during dinner Pletnikoff put his hand on her thigh, and she objected. Pletnikoff was familiar with her in other ways as well. He tried to get her to sit closer, but she refused. He patted her hand and kissed her on the cheek. An official with the Department of Housing and Urban Development (HUD), and a former employee of Mr. Pletnikoff's at the Aleutian Housing Authority joined S.J. and Pletnikoff for dinner. S.J. testified that the HUD employee was someone she definitely felt she should know for business reasons.

After dinner the HUD official took the fourth member of the party home, and then met Mr. Pletnikoff and S.J. at the Keyboard Lounge for drinks and dancing. At the Keyboard Lounge Mr. Pletnikoff put his arm around S.J. and wanted to kiss her, but S.J. testified that she ignored him.

Later, Pletnikoff brought S.J. to two other bars. Ultimately, S.J. flagged a cab to take her back to her car, and Pletnikoff joined her in the cab. S.J. testified that Pletnikoff gave confusing directions to the cab driver, resulting in their riding around town for a while, but ultimately arriving at Mr. Pletnikoff's car. Pletnikoff allegedly promised to drop S.J. at her car, parked a few blocks away, so she went with him in his car. Instead of dropping her off at her car, however, he drove her to his home. S.J. testified that when Pletnikoff passed her car, she mentioned that to him and asked to be dropped off, telling him that she was tired and wanted to go home. Pletnikoff responded he wanted to talk to her and take her for a drive. She continued to object, she testified, but Pletnikoff became silent and continued driving.

When they reached his home, S.J. testified, Pletnikoff told her that he wanted to show her something and took her arm and brought her into the house. He showed her a picture of Jimmy Carter and himself, and began playing with a tape recorder. She became annoyed and sat down on the couch. According to S.J., Pletnikoff grabbed her by the ankles and pulled her onto the living room floor, and started unbuttoning her dress. S.J. then allegedly told Pletnikoff that she did not want him to touch her, and again told him she wanted to go home. Pletnikoff continued unbut-

toning her dress, she says, keeping his forearm across her shoulders so she could not move. According to S.J., he told her he loved her and could do things for her, and she responded that he did not even know her and asked him to let her go. He allegedly took her out of her dress and coat, took off her shoes, and partially took off her panty hose. He unsuccessfully sought to have genital intercourse at this point, and she testified she began to cry.

Pletnikoff then carried her into the bedroom, where he penetrated her a number of times genitally and digitally. S.J. testified that she complained, screamed and cried during all of this, and that eventually Pletnikoff told her to shut up. She said she had her eyes closed and when she opened them he had a small knife in his hand which she could not see very well, except that a little bit of light coming into the room reflected off the handle. Pletnikoff never specifically threatened to cut her with the knife, but told her to keep quiet. Ultimately, S.J. escaped when Pletnikoff fell asleep. She recovered part of her clothing, dressed, and made her way barefoot to a twenty-four-hour convenience market located approximately a block away. She called A.E., who came to pick her up. Later that day, S.J. called the police and was examined at a hospital.

Pletnikoff testified and denied S.J.'s allegations that he had forced her to have intercourse with him. He denied that S.J. was annoyed at his actions at dinner, and said that she seemed happy with his company. He stated that at the Keyboard Lounge he and S.J. danced and might have kissed a little bit. When leaving, Pletnikoff testified that S.J. put her shoeless feet "on my lap and asked me to put her shoes on for her." S.J. conceded this, indicating she always took her high heels off when she danced, and that she had asked Pletnikoff to buckle them for her. Pletnikoff said that he and S.J. stayed at the bars until they closed, and then went to his place. He said they conversed freely during the trip to his house, and ultimately engaged in consensual sexual relations. He testified that she never indicated that she did not wish to have intercourse with him, and denied making any threats to her or showing her a knife. Pletnikoff admitted having intercourse with A.E. but denied any coercive behavior.

During the trial, the court gave the following jury instruction without objection:

It is a defense to a charge of sexual assault in the first degree that the defendant entertained a reasonable and good faith belief that the female person voluntarily consented to engage in sexual intercourse. If from all the evidence you have a reasonable doubt whether the defendant reasonably and in good faith believed she voluntarily consented to engage in sexual intercourse, you must give the defendant the benefit of that doubt and acquit him of said charge.

This was the only jury instruction relating to the requisite mental state for first-degree sexual assault.

## DISCUSSION

### A.E.'S TESTIMONY

The state concedes that A.E.'s testimony regarding her encounter with Pletnikoff was inadmissible under Alaska Evidence Rules 403 and 404(b).

We are satisfied that the trial court erred in admitting evidence of Pletnikoff's encounter with A.E. Our prior cases establish two principles derived from the interplay between Alaska Evidence Rules 403 and 404.[1] First, the trial court has no

---

1. While there is some overlap in the permissible uses of other bad acts evidence, it is unlikely that evidence would ever be admissible in a given case for all the reasons mentioned in A.R.E. 404(b). *See Moor v. State,* 709 P.2d 498, 504–06 (Alaska App.1985). The trial court should therefore carefully evaluate the reasons offered for admissibility and, if it finds the evidence admissible, indicate the precise basis for its admission. A jury should not be told that certain evidence is admitted for all the purposes spelled out in A.R.E. 404(b), if most of those purposes are irrelevant to the case. *See* 22 C. Wright & K. Graham, *Federal Practice and Procedure: Evidence* § 5240 at 479 (1978) (referring to a failure to differentiate between the

discretion to admit evidence of a character trait solely for the purpose of proving that the person acted in conformity with that trait at a later time. Second, the court has limited discretion to admit character evidence for other purposes, if its probative value outweighs the considerations set out in Rule 403, *i.e.*, the creation of unfair prejudice, the confusion of issues and the delay of the trial. *Moor v. State*, 709 P.2d 498, 504–06 (Alaska App.1985); *Lerchenstein v. State*, 697 P.2d 312, 315 (Alaska App.1985), *petition for hearing granted* (Alaska, June 25, 1985).

■ An examination of the prosecutor's offer of proof establishes that the testimony he anticipated from A.E., and in fact received, clearly violated Alaska Evidence Rule 404(a) and did not fall within any of the exceptions set out in 404(b). The prosecutor sought to show that Pletnikoff had a character trait or propensity for forcibly seducing women by wining and dining them and, more significantly, falsely promising them that if they were nice to him he would use his influence to advance their careers. It is important that the prosecutor stressed the falsity of Pletnikoff's promises to A.E. in arguing the relevance of her testimony to the case of S.J. The evidence was inadmissible for this purpose. *See* Alaska Rule of Evidence 404(a).

■ It is equally clear that none of the exceptions in A.R.E. 404(b) is applicable here. Pletnikoff conceded his identity as the person who had intercourse with S.J.,

hence his identity was not in issue. 2 J. Wigmore, *Evidence* § 410 at 477 (Chadbourn rev. ed. 1979) (hereinafter Wigmore). Therefore the state was not entitled to establish a "modus operandi." *People v. Tassell*, 36 Cal.3d 77, 201 Cal.Rptr. 567, 573–74, 679 P.2d 1, 7–8 (1984). The evidence was not relevant to establish a motive. The defendant's sexual contact with A.E. does not indicate a motive for intercourse with S.J., and, hence, is inadmissible for that purpose. Wigmore, § 402(2)(c) at 463. Evidence regarding a motive to have intercourse with one woman does not support an inference that the defendant was motivated to have intercourse with a second. *Id.*, § 398 at 445. In any event, since Pletnikoff conceded an intent to have sexual intercourse with S.J., and in fact, had intercourse with her, his intent was not an issue. *Id.*, § 357 at 334.

■ More troublesome is the question of design or plan. In conceding error, the state acknowledges that the evidence showed the plan or scheme argued at trial by the prosecutor, but recognizes that the plan or scheme, to the extent established, was a plan to seduce, or perhaps coerce by false promises of economic opportunity, rather than a plan to rape by force and violence. If this is true, the plan or design proved was irrelevant to the charge that Pletnikoff sexually assaulted S.J.[2] It could also be argued that the evidence was relevant to corroborate S.J.'s testimony as to the manner of Pletnikoff's attempted se-

various purposes permitted under Federal Rule of Evidence 404(b) as the "'smorgasbord' approach to analysis of other crimes evidence").

**2.** At trial and on appeal the state confuses proof of a "plan" with proof of a *modus operandi*. *See* 22 C. Wright & K. Graham, *Federal Practice and Procedure: Evidence* § 5244 at 501–02 (1978 & Supp.1985 at 359). A common method of achieving a criminal end, if sufficiently distinctive, may be shown to identify the defendant as the perpetrator. *People v. Rivera*, 41 Cal.3d 388, 221 Cal.Rptr. 562, 564–65, 710 P.2d 362, 364–65 (1985). As we have seen, however, Pletnikoff's identity was not in issue. As Wright and Graham note, "To be properly admissible under Rule 404(b) as evidence of a 'plan' it is not enough to show that each crime was 'planned'

in the same way; rather, there must be some overall scheme of which each of the crimes is but a part." *Id.*, Supp.1985 at 359. Wright and Graham discuss a recent Washington case, *State v. Bennett*, 672 P.2d 772 (Wash.App.1983). In their view, the *Bennett* court wrongly admitted propensity evidence as demonstrative of a *modus operandi*. Bennett had enticed a number of teenage runaways into exchanging sex for food and shelter. Earlier incidents were admitted to prove that the defendant had a "plan" to take advantage of runaways in this fashion. According to Wright and Graham, this is evidence of propensity, not plan. *Federal Practice and Procedure: Evidence* § 5244 at 359 (Supp.1985). *See Oswald v. State*, 715 P.2d 276 (Alaska App. 1986).

duction, in part contradicting, and therefore impeaching, Pletnikoff's testimony as to his actions with S.J. The evidence is marginally relevant for that purpose. Nevertheless, when used for this purpose it clearly violates Alaska Evidence Rule 404(a). A.E.'s testimony corroborates S.J.'s only to the extent that it establishes that Pletnikoff had a character trait, *i.e.*, a propensity to mislead women in order to force his attentions on them, and acted in accordance with that trait on both occasions.[3]

■ We recognize that the cases from other jurisdictions are in dispute as to the admissibility of similar evidence to show design or plan. See 2 J. Wigmore, *Evidence* § 357(3) at 334 (Chadbourn rev. ed. 1979) and cases there cited. As we noted in *Moor*, however, evidence of design or plan, used in this way, is virtually indistinguishable from evidence of a lustful disposition or propensity, and, as such, is admissible only in those cases where the defendant's actions involve the same victim.[4] 709 P.2d at 506–07.

### INSTRUCTION NUMBER 19

The state concedes that the trial court erred in giving Instruction No. 19, which told the jury that only a good faith and reasonable mistake of fact regarding S.J.'s consent would constitute a defense. *See*

Laseter v. State, 684 P.2d 139 (Alaska App. 1984); *Reynolds v. State*, 664 P.2d 621 (Alaska App.1983). Nevertheless, the state argues that the error did not constitute ineffective assistance of counsel because it was not plain error, *i.e.*, so obvious and so substantially prejudicial as to deny Pletnikoff a fair trial. *See Potts v. State*, 712 P.2d 385 (Alaska App.1985) (suggesting that the tests for plain error and ineffective assistance of counsel are virtually the same regarding errors committed during trial in open court). Under certain circumstances, similar errors have been held not to be plain error. *See, e.g., Walker v. State*, 652 P.2d 88, 92 n. 7 (Alaska 1982); *Reynolds v. State*, 664 P.2d at 627–28; *Bidwell v. State*, 656 P.2d 592, 595 (Alaska App.1983). We are satisfied that plain error occurred here, when the error in the jury instruction is combined with the court's error in admitting the testimony of A.E.

In *Bidwell*, a kidnapping case, neither the defendant nor his accomplice testified, and there was undisputed evidence of physical violence and dangerous weapons. 656 P.2d at 593–94. In *Walker*, the defendant and others kidnapped a complete stranger and took her to an apartment where she was forcibly sexually assaulted. 652 P.2d at 89–90. As in *Bidwell*, neither Walker nor his alleged accomplice testified and the

---

3. A.E.'s testimony was marginally relevant to corroborate S.J.'s testimony regarding Pletnikoff's efforts to lure her to an isolated place where he could more easily overcome her resistance. Nevertheless, Pletnikoff's "deceptions" were fairly commonplace and his treatment of the two women in material respects, dissimilar. He and A.E. went to a realty office, while Pletnikoff and S.J. went to the former's home. Even if the two episodes were identical, the former incident would have been inadmissible in a trial regarding the latter, because use of the evidence to corroborate is simply its use to show propensity under another name. *Tassell*, 679 P.2d at 6–8; 22 C. Wright & K. Graham, *Federal Practice and Procedure: Evidence* § 5248 at 520–22 (1978). *See id.*, §§ 5177 and 5240 nn. 43, 47.

4. The trial judge concluded that the evidence was also admissible to show absence of accident or mistake. In this he erred. Genital intercourse is rarely accidental. *See, e.g., Moor v. State*, 709 P.2d at 510 (where evidence shows

genital intercourse, fellatio, or cunnilingus, the conduct is sufficiently unequivocal to establish sexual motive; no separate instruction on sexual motive or intent is necessary). As one author points out:

First, it is obvious that when a mistaken belief in consent is claimed, inadvertence is in no way at stake. The problem is rather one of the accountability of an actor who has adverted [intentionally engaged in . intercourse], but has come to an ill-grounded conclusion about the relevant fact [his partner's consent]. [Footnotes omitted.]

Pickard, *Culpable Mistakes and Rape: Relating Mens Rea to the Crime*, 30 U. Toronto L.J. 75, 80–81 (1980). The state concedes that to the extent that Pletnikoff was arguing mistake of fact regarding S.J.'s intentions, his beliefs regarding A.E.'s intentions the preceding week would be irrelevant. We agree.

court found that, in addition to failing to object to the court's refusal to give an appropriate instruction, Walker produced no evidence warranting such an instruction. 652 P.2d at 92 n. 7. In contrast, Pletnikoff testified at length regarding his belief that S.J. consented to intercourse.

*Reynolds* is a case closer on its facts to this one. There, however, the prosecution conceded in final argument that it had the burden of establishing that the victim communicated her lack of consent to Reynolds, and both parties argued the evidence with this assumption in mind. 664 P.2d at 628. In fact, it was possible to construe the instructions that were actually given as placing a greater burden on the state than it was required to prove, *i.e.*, that Reynolds knew of his victim's lack of consent, rather than merely being aware of a substantial risk that she did not consent. *See Reynolds*, 664 P.2d at 627–28. Unlike the final argument in *Reynolds*, the prosecutor's final argument here stressed whether S.J. subjectively consented to Pletnikoff's advances, as opposed to whether S.J. communicated to Pletnikoff an unwillingness to have intercourse with him.

 Consequently, the error in admitting A.E.'s testimony was exacerbated by the failure to instruct the jury properly regarding Pletnikoff's appreciation of the risk of S.J.'s nonconsent, and served to deny Pletnikoff a fair trial. In determining whether Pletnikoff was reasonable in his interpretation of S.J.'s conduct, the jury was in effect asked to judge his conduct with both women against an inappropriate standard. The inaccurate jury instruction and A.E.'s testimony reinforced the prosecutor's arguments which pictured Pletnikoff as a predator against women whose conduct with A.E. and S.J. was immoral, even if not forceful or violent. Thus, the prosecutor in his argument stressed the fact that Pletnikoff's encounters with A.E. and S.J. took place during a two-week period while Pletnikoff's wife was out of state, visiting her sick relatives. In the prosecutor's words, "the mice can play when the cat's gone." In addition, in questioning

Pletnikoff, the prosecutor stressed that Pletnikoff's interest had shifted from A.E. to S.J., and implied that Pletnikoff had never delivered on his promises of economic benefit to A.E. Pletnikoff was therefore required to defend against two separate claims of inappropriate sexual behavior. These three components: the prosecutor's argument, the erroneous jury instruction, and the improperly admitted testimony create a substantial risk that a jury might condemn Pletnikoff for inappropriate sexual behavior which fell short of sexual assault. We are, therefore, unable to conclude that the two errors considered together were harmless. *Love v. State*, 457 P.2d 622 (Alaska 1969). The cumulative effect of the errors denied Pletnikoff a fair trial. *See People v. Holt*, 37 Cal.3d 436, 208 Cal.Rptr. 547, 560, 690 P.2d 1207, 1220 (1984); *State v. Martin*, 101 N.M. 595, 686 P.2d 937, 942–43 (1984); *Hawkes v. State*, 644 P.2d 111, 113 (Okla.Crim.App.1982).

The judgment of the superior court is REVERSED and this case REMANDED for a new trial.