James MOOR, II, Appellant,

v.

STATE of Alaska, Appellee.

No. A–315.

Court of Appeals of Alaska.

Nov. 8, 1985.

Stephen G. Marks and Michael A. Steinmann, Baxter, Douglas & Marks, Juneau, for appellant.

Robert D. Bacon, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, J.

## OPINION

SINGLETON, Judge.

James Moor, II, was convicted by a jury of one count of sexual abuse of a minor, a

class C felony in violation of former AS 11.41.440(a)(1) [1] and two counts of contributing to the delinquency of a minor, a class A misdemeanor in violation of former AS 11.51.130(a)(4). [2] The felony conviction was based on an accusation by A.F., a thirteen-year-old girl, that Moor had digitally penetrated her while the two were seated together in a Juneau moviehouse. [3]

The two misdemeanor convictions were based on A.F.'s allegations that Moor had touched her breasts on two occasions. [4] On appeal, Moor raises a number of evidentiary issues and argues that the jury instructions given constituted error under this court's analysis in *Flink v. State*, 683 P.2d 725 (Alaska App.1984) and *J.E.C. v. State*, 681 P.2d 1358 (Alaska App.1984). We reverse Moor's misdemeanor convictions but affirm his felony conviction.

## FACTS

Julie Neyhart is a social worker employed in child protection for the State Department of Health and Welfare Division of Family & Youth Services. On March 24, 1983, she received a report from Maureen Eberhart, who was employed at Gastineau Elementary School as a school nurse, that C.W., a student, had been overheard complaining that she had been sexually molested by her uncle, James Moor, II. Apparently, a grocery store clerk had heard C.W.

complaining of the molestation to a friend and contacted the school nurse.

Neyhart contacted Ms. Eberhart and arranged to interview C.W. at school during the morning of March 25, 1983. C.W. met with Neyhart and Eberhart at that time. Neyhart described C.W. as "a friendly, open young lady and it was not as difficult for her to talk as it sometimes is for children. She was quite comfortable in answering my questions."

Neyhart testified that C.W. told her that Moor had touched her on a number of occasions causing her discomfort. C.W. allegedly told Neyhart that she could not specify the dates upon which she was sexually molested. C.W. told Neyhart, however, that all of the molestations occurred on Sundays "because that was the day that her family gathered at her uncle's—well, I guess it's her grandparents' house where Uncle Jim lived." C.W. told Neyhart that the "uncomfortable touches" generally occurred when she and Moor were watching television in the living room. She told Neyhart that she and Moor would sit on the couch; the back of the couch was situated in such a way that it separated them from other people sitting nearby. She told Neyhart that Moor would slide his hand under her shirt and touch her breast and that other times he would "snap her bra," while watching television. C.W. told Neyhart that, on at least two occasions, Moor had

---

**1.** Former AS 11.41.440 provided:

*Sexual Abuse of a Minor.* (a) A person commits the crime of sexual abuse of a minor if, being 16 years of age or older, he engages in (1) sexual penetration with a person who is under 16 years of age but 13 years of age or older; or
(2) sexual contact with a person who is under 13 years of age.
(b) Sexual abuse of a minor is a class C felony.

**2.** Former AS 11.51.130 provided in relevant part:

*Contributing to the Delinquency of a Minor.* (a) A person commits the crime of contributing to the delinquency of a minor if, being 19 years of age or older, he
... (4) engages in sexual contact with a child under 16 years of age but 13 years of age or older.

... (b) Contributing to the delinquency of a minor is a class A misdemeanor.

**3.** *See* former AS 11.81.900(b)(52), which provided:

"Sexual penetration" means genital intercourse, cunnilingus, fellatio, anal intercourse, or an intrusion, however slight, of an object or any part of a person's body into the genital or anal opening of another person's body; each party to any of the acts defined as "sexual penetration" is considered to be engaged in sexual penetration ....

**4.** Former AS 11.81.900(b)(51) provided:

"Sexual contact" means:
(a) The intentional touching, directly or through clothing, by the defendant of the victim's genitals, anus, or female breasts ....

touched her in a way that she did not feel was comfortable.

Neyhart testified that C.W. indicated that it was relatively easy to extricate herself because other people were there. Sometimes she retreated by leaving the couch and just going over to sit very close to the table where the rest of her family were seated. On other occasions, she would just go outside and play. Finally, C.W. told Neyhart that when she was a much younger child she remembered an occasion when Moor had rubbed her back and "then moved his hands and left them on her breasts." Apparently, C.W. considered this incident quite significant.

Neyhart testified that C.W.'s demeanor was outgoing up until the point that Neyhart indicated that C.W.'s mother would have to be informed of C.W.'s accusations. This made C.W. very uncomfortable. Neyhart asked her why and C.W. replied,

> Because my mother will feel very badly to think my Uncle Jim would have done this. That's her brother and she would not like to think that he would have done this to me.

Neyhart said that this was the only time during the interview that C.W. appeared visibly upset.

Neyhart testified that, during this interview, C.W. told Neyhart that Moor had also molested A.F., C.W.'s best friend. C.W. told Neyhart that Moor had molested A.F. on March 20, 1983, the previous Sunday. C.W. told Neyhart that Moor, A.F., and she had gone to the movies and that C.W. and A.F. had sat down in front while Moor sat in the rear. C.W. told Neyhart that A.F. told her that she was going to ask Moor for some money and went back to see him. When A.F. had not returned after five minutes, C.W. went up to look for her. C.W. told Neyhart that she saw A.F. leaning over Moor and saw Moor pull his hand away from A.F.'s crotch area. C.W. informed Neyhart that A.F. left and returned with C.W. to their seats; Neyhart was told that A.F. had been crying, but that A.F. told C.W. she didn't wish to talk about it.

Neyhart testified that C.W. also indicated to Neyhart that she had seen two other incidents involving A.F. and Moor in the living room on the couch area at her grandparents' home. She told Neyhart that, on one occasion, she observed Moor and A.F. sitting together on the couch. C.W. saw A.F. get up and leave; A.F.'s bra was unfastened and A.F. was upset. C.W. said there was another occasion when she observed Moor and A.F. sitting on the couch and saw Moor pull his hand away. C.W. said that Moor had told the girls that they had better not tell anyone or they would be in trouble.

Neyhart testified that she subsequently interviewed A.F. and A.F.'s mother; A.F. confirmed C.W.'s report. Neyhart testified that she telephoned L.W., who is C.W.'s mother and Moor's sister, who was understandably upset by the contact. L.W. promised to talk to C.W. and to meet with Neyhart that afternoon. During the interview, both C.W. and her mother were in tears. Neyhart noted a substantial change in C.W.'s demeanor. During the morning interview, C.W. had indicated that her contacts with Moor were unpleasant and that she tried to avoid them. During the afternoon interview, however, C.W. characterized them as "not that bad."

C.W. and her mother were subsequently interviewed by Diane Dome, an Alaska State Trooper. C.W., her mother L.W., and her father, G.W., were present. C.W.'s parents denied that anything illegal had taken place. Trooper Dome asked permission to speak to C.W. privately. Permission was reluctantly given by the parents. Dome asked C.W. if she'd observed Moor put his hands inside A.F.'s pants. C.W. replied that she had not. Trooper Dome testified about the interview:

> A: [Trooper Dome] ... [W]hen I first asked her the question. And I said, "You did not see him put her [sic] hand in his pants—his hand in her pants?" And she said, "Well, not completely inside the pants." And, I said, "What did you see?" And she demonstrated by putting her hand

inside the waistband of her pants, and she said, "Like that."

Q: [Prosecutor] Is that pretty much the extent of what she told you about that?

A: I think then I said "Did he put his hand inside her pants?" and she said "Yes."

After these interviews, C.W.'s parents apparently forbade contact between the girls. In addition, they refused to allow C.W. to be interviewed by the district attorney's office. L.W., C.W.'s mother, explained her reasons as follows:

Q: [Prosecutor] Okay. You have not wanted your daughter to talk with my office, is that right?

A: [L.W.] I feel you guys are out to hurt my brother. You don't know him, and I know both of them, my brother and [A.F.] very well. My brother is a very devout Catholic and I know he's telling the truth. I've known Jimmy for a lot of years and he never, ever has done anything wrong or lied.

Q: And you would refuse to believe any allegation to the contrary?

A: Yes.

Q: I'm still not sure—feel that your daughter, with you present, talking with my office we would have put words in her mouth or twisted her story?

A: You weren't there for us, so—and I don't feel that she needs to be subjected anymore than she has already had to go through.

Q: I can understand that. Did you allow her to discuss this case with [defense counsel]?

A: Yes. I let her go in and tell what she knew.

Q: But you wouldn't let her come in and tell what she knew in the district attorney's office, even with you present?

. . . . .

A: No.

A.F. and C.W. testified at trial. They indicated that on March 20, 1983, Moor took them to see a movie. The girls ran to the front of the theater and sat in the seats closest to the screen. Moor sat three rows from the rear of the theater. A.F. testified that, early in the movie, she left her seat and went to ask Moor if it was all right for the girls to sit apart from him. According to A.F., Moor directed her to sit down and to place her right leg over his legs. He then began rubbing her leg. He unzipped her pants, stuck his hand down her pants, and put his finger up her vagina and moved it around. A.F. testified that he kept his finger inside her vagina for three to five minutes. A.F. didn't say anything because she was scared. When Moor "stopped" he told her not to tell anyone.

When A.F. returned to her seat, she told C.W. what had happened. C.W. told A.F. to tell C.W.'s mother "or someone" when they got home. A.F. testified that she later approached Moor again, by herself, to ask for money for refreshments and game machines; Moor gave her some money, apparently without any further conversation or contact.

C.W. testified that A.F. went to the rear of the theater only once, and that C.W. eventually followed A.F. to see what was taking so long. C.W. said that A.F. was seated next to Moor and that Moor's hand was next to A.F. "like he was giving her money." C.W. said that after A.F. and C.W. returned to their seats, A.F. began "crying a little bit," told C.W. what Moor had allegedly done, but did not appear upset. C.W. denied that she told Trooper Dome that she had seen Moor's hand in A.F.'s pants. She stated:

A: [C.W.] I told her that his hand wasn't in her pants or nothing, but it was over by her, like he was giving her something.

Q: [Prosecutor] You told her that at first?

A: Yes.

Q: Did you ever tell her his hand was in her pants?

A: No, because it wasn't in her pants.

Q: Did you ever demonstrate to her how his hand was? Did she ask for you to show her?

A: Not that I remember.

Q: Did Julie Neyhart ask you about the same thing?

A: Yes.

Q: Do you remember what you told her?

A: The same thing.

Q: The same thing? That his hand was not in her pants?

A: No, it was not in her pants.

Q: But it was where?

A: It was down by her pants. It wasn't in it. It was like he was handing her money or something.

Neither A.F. nor C.W. immediately reported the incident. C.W. testified that she had previously been a friend of A.F., but that they were no longer friends because they didn't see each other anymore.

C.W. conceded that her parents would not let her talk to the district attorney's office, but that she had spoken to defense counsel on two occasions and that Moor was present on one occasion. C.W. also conceded that she had told the school nurse that Moor had hurt A.F. at the movie, but explained this as simply repeating what A.F. had told her.

On cross-examination, C.W. testified that A.F. had a reputation at school for making up stories about sex. On re-direct examination, C.W. clarified her remark about A.F.'s reputation by stating "Well, that she's made up stories that she had made it all the way with boys and she really hasn't. She wants everybody to think so." The following dialogue then took place:

Q: [Prosecutor] Has she made up—and you're a close friend so you know these stories are not true?

A: [C.W.] Yeah.

Q: Is that right?

A: Yes.

Q: Any other kinds of sex stories that you, as her close friend, or at least then knew that were not true?

A: Well, about her and R.

Q: About her and who?

A: R.W.

Q: What about her and your Uncle Jimmy? Are you telling the jury that she made up these stories about him?

A: I won't say she is.

Q: You believe that they are true, don't you?

A: No, I don't.

Q: You don't believe that your Uncle Jimmy would do something like that?

A: No.

Q: To A.F. or to anyone is that right?

A: Right.

Over defense objection, C.W. was then questioned about her own statements to the social worker in the initial interview. She denied saying that her uncle had reached under her shirt to touch her breasts, only that he had recently reached under her shirt and snapped her bra, which had "bugged her." She said that "a long time ago" her uncle had rubbed her back and touched her then-undeveloped breasts, but "nothing happened."

On recross-examination, C.W. agreed with defense counsel that she had told him "Ms. Neyhart tried to get information out of me that really didn't happen." She denied that she had changed her testimony and stated that Trooper Dome and Neyhart were testifying falsely about what she had said.

C.W. also testified in response to questions by defense counsel that, on one occasion, A.F. came crying to her saying that R.W., a fellow student, "hurt her and stuff" but later retracted the statement saying that she "wanted him to." On a second occasion, A.F. apparently told C.W. that she had "made it all the way with [G.D.]," another student, but later admitted that this was false.

C.W. was called again as the defense's first witness. She stated that Ms. Neyhart had misquoted her, that there were no re-

cent occasions on which Moor had touched her, and that her objections were only to him "snapping her bra," an annoying act that she did not consider in any way sexual.

The defense then called C.W.'s parents, G.W. and L.W., both of whom testified that they observed the two girls and Mr. Moor after the three returned from the theater on March 20, 1983, and that the girls' demeanor was inconsistent with any offensive conduct by Moor. Both parents indicated that A.F. was in high spirits until her mother refused to permit her to eat dinner with the Moor family and that A.F. begged to be permitted to stay, indicating that Moor could drive her home.

Finally, James Moor, II, testified on his own behalf. He said that he was twenty-five years of age, single, a college graduate working for N.C. Machinery Company as a diesel mechanic. He indicated that he had known C.W. all her life, and A.F. since she moved in with V.M., Moor's other sister about four and a half years before. He essentially viewed A.F. as a member of his family. Moor stated that he often socialized with the girls and took them places. He testified that, on March 20 he had gone to the movies in Juneau to see "Tootsie." At the girls' request, he allowed them to accompany him. L.W., C.W.'s mother, gave him ten dollars for the girls' expenses. During the movie the girls continuously bothered him for money so that they could play electronic video games and buy popcorn and coke. He indicated that he was sitting among a number of people when A.F. first approached him at the theater and that he may have asked her to sit down so that she would not block other people's view. He denied having any sexual contact with her at all. He denied that he had ever touched A.F. or C.W. on the breast intentionally. He did indicate that he had roughhoused with A.F. and C.W. many times and in fighting with them or wrestling with them might have touched their breasts accidentally, but never with a sexual or premeditated purpose. He expressed disbelief that C.W. had accused him of touching anyone's breast and attrib-uted the accusations to the social worker's mischaracterizations of C.W.'s statements.

## DISCUSSION

Over Moor's objection, the state was permitted to cross-examine C.W. regarding allegations she allegedly made that James Moor had sexually molested her. Moor argues that the testimony was prejudicial error. Our consideration of this issue begins with two evidence rules, A.R.E. 404(b) and 403. Alaska Rule of Evidence 404(b) provides:

(b) *Other Crimes, Wrongs or Acts.* Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Alaska Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

These two rules must be construed together. *Lerchenstein v. State,* 697 P.2d 312, 315 (Alaska App.1985), *petition for hearing granted,* (June 25, 1985). Both rules are derived from virtually identical federal rules of evidence. Under the prevailing federal view, Evidence Rule 404(b) simply states a truism. If evidence of other crimes is relevant for some purpose in a case, then it is admissible unless that purpose is solely to show criminal propensity. Thus, the federal cases interpret the rule as one of inclusion rather than exclusion, and do not consider it inconsistent with the general preference expressed in Evidence Rule 403 that relevant evidence be admitted unless its probative value is clearly outweighed by unfair prejudice. *United States v. Gustafson,* 728 F.2d 1078, 1083

(8th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984); *United States v. Naranjo,* 710 F.2d 1465, 1467–68 (10th Cir.1983); *United States v. Mehrmanesh,* 689 F.2d 822 (9th Cir.1982); *United States v. Long,* 574 F.2d 761, 766 (3d Cir.), *cert. denied,* 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978); *cf. United States v. Gray,* 730 F.2d 733 (11th Cir.1984).

Under the federal view, the admission of evidence against a defendant of his other crimes which is relevant to some issue in the case, is committed to the discretion of the trial court. *See, e.g., United States v. Zeuli,* 725 F.2d 813, 816 (1st Cir.1984); *United States v. Naylor,* 705 F.2d 110, 112 (4th Cir.1983); *United States v. Hamilton,* 684 F.2d 380, 384 (6th Cir.), *cert. denied,* 459 U.S. 976, 103 S.Ct. 312, 74 L.Ed.2d 291 (1982). Normally, these federal precedents and the commentary to the federal rules upon which they rely would be persuasive in interpreting our comparable Alaska rules. However, in *Lerchenstein,* we noted that under *Oksoktaruk v. State,* 611 P.2d 521 (Alaska 1980):

> When evidence of prior misconduct is involved, Evidence Rule 404(b) modifies the normal balancing process under Evidence Rule 403 by requiring the trial court to begin with the assumption that the evidence should be excluded. We recognize that Alaska Rule of Evidence 404 is based on Federal Rule of Evidence 404 and that the prevailing view under federal law is to view Evidence Rule 404 as a rule of inclusion rather than exclusion. Thus, under the federal rules, if

the evidence of other misconduct is relevant for purposes other than propensity, the evidence is presumptively admissible. [Citations omitted.] Alaska Rule of Evidence 404, however, is a "rule of exclusion of evidence and not one of admission." *Oksoktaruk,* 611 P.2d at 524, *quoting United States v. Burkhart,* 458 F.2d 201, 204 (10th Cir.1972); thus the opposite presumption arises.

*Lerchenstein,* 697 P.2d at 315 n. 2.

We therefore concluded:

> The exclusionary provisions of Evidence Rule 404(b) represents the "presumption in our law that the prejudicial effect of introducing a prior crime outweighs what probative value may exist with regard to propensity. No case by case balancing is permitted." [Citation omitted.] When, however, a prior bad act is relevant to a material fact other than propensity, the court may admit the evidence if an Evidence Rule 403 balancing shows the evidence to be more probative than prejudicial. In making this balance, the Alaska Supreme Court has cautioned that "if prior crimes were found admissible whenever offered to prove a fact classified as material to the prosecution's case, 'the underlying policy of protecting the accused against unfair prejudice ... [would] evaporate through the interstices of the classification.'" [Citations omitted.]

697 P.2d at 315.[5]

▆▆▆ In order to implement these policies, and to enable the trial court to proper-

---

5. The author of this opinion would note that we are obliged to follow decisions of our Alaska Supreme Court whether we agree with them or not and, regardless of whether they are rightly or wrongly decided. *See Harris v. State,* 678 P.2d 397, 402 (Alaska App.1984) (Singleton, J., dissenting), *petition for hearing granted* (May 30, 1984). When the federal courts are in disagreement as to the proper interpretation of a federal rule, upon which an Alaska rule is based, the Alaska Supreme Court is certainly free to choose the minority position in construing the Alaska rule if it wishes to do so. It is possible, however, that the supreme court did not knowingly adopt a minority position in *Oksoktaruk v. State,* 611 P.2d 521 (Alaska 1980). A reading of *Oksoktaruk* indicates that the su-

preme court viewed *United States v. Burkhart,* 458 F.2d 201 (10th Cir.1972), as offering the only interpretation of the interplay between the federal rules in question. The court does not acknowledge an alternate view based on the commentary to the federal rules. Thus, it appears that the supreme court may have been unaware of the substantial authority holding that Rule 404 was intended as a rule of inclusion rather than exclusion and was intended by its drafters to make evidence of other crimes more admissible rather than less admissible than it had been under prior law. It also appears that despite *Burkhart,* the Tenth Circuit now agrees with this interpretation. *See United States v. Naranjo,* 710 F.2d 1465, 1467 (10th

ly perform its function, the prosecution should be required to give advance notice to the defendant and the court, out of the presence of the jury, of its intent to utilize any evidence governed by Alaska Evidence Rule 404(b). When the prosecutor seeks permission to utilize such evidence, the trial court should carefully scrutinize the proffered reasons for the use of the evidence. This will insure that the evidence sought to be admitted has relevance apart from propensity. If it does not, the evidence must be excluded. If it does, the court must then determine whether the nonpropensity relevance outweighs the presumed highly prejudicial impact of the evidence. *Lerchenstein*, 697 P.2d at 316, *citing Freeman v. State*, 486 P.2d 967, 977–79 (Alaska 1971).

In evaluating the probative value of the evidence, the court must consider whether or not there was sufficient other evidence introduced for the same purpose. If sufficient other evidence has been introduced, the evidence of other crimes must be excluded so that "[t]enuous or marginal probative value of prior crimes evidence [will] never be allowed to serve as an excuse for implanting prejudice in the minds of the jury." 697 P.2d at 318, *quoting Freeman*, 486 P.2d at 979. *See Fields v. State*, 629 P.2d 46, 48–52 (Alaska 1981); *Frink v. State*, 597 P.2d 154, 170–71 (Alaska 1979).

We do not suggest that, in order to be admissible, other crimes evidence must be strictly necessary to the prosecution's case in the sense that failure to admit the evidence would leave the case subject to a motion for directed judgment of acquittal, a position rejected in *United States v. Kane*, 726 F.2d 344 (7th Cir.1984). We do stress, however, that the issue upon which the evidence is offered must be truly disputed in the case. Thus, where the prosecution wishes to use the evidence to rebut

an anticipated defense, the trial court should seriously consider delaying the offer until the prosecution's rebuttal in order to ensure that the anticipated defense will in fact be raised. *See, e.g., United States v. Halper*, 590 F.2d 422, 432 (2d Cir.1978).

■ Applying these rules to the instant case, we conclude that, under the peculiar circumstances of this case, the trial court did not err in permitting the prosecution to impeach C.W. with extrinsic evidence that Moor had molested her. At the outset, however, we reject the state's contention that incidents of sexual abuse are always admissible in sexual abuse cases to show a "lewd disposition." The state relies on *Burke v. State*, 624 P.2d 1240, 1249 (Alaska 1980).

In *Burke*, the supreme court considered a sexual offense exception to the general rule excluding evidence of other crimes or wrongful acts, which had evolved in other jurisdictions. Under this exception, such evidence was admissible to show "lewd disposition." The court decided that, where the prior alleged acts are all with the same victim, evidence of those acts is admissible. It reserved the more difficult question of whether evidence of prior sexual misconduct with other victims should be allowed. 627 P.2d at 1249. We decline to extend the *Burke* ruling to include evidence of sexual conduct with persons other than the victim. When evidence of the defendant's sexual conduct with someone other than the victim is introduced, such evidence of "lewd disposition" is conceptually indistinguishable from evidence of "propensity." Our rejection of the state's position does not mean that a trial court should never allow the admission of evidence of prior sexual misconduct with someone other than the victim in sexual abuse cases. It does mean that the trial court should carefully scrutinize such evidence to ensure that it does come

Cir.1983); *United States v. Tisdale*, 647 F.2d 91, 93 (10th Cir.), *cert. denied*, 454 U.S. 817, 102 S.Ct. 95, 70 L.Ed.2d 86 (1981); J. Weinstein & M. Berger, Weinstein's Evidence § 404 [08] (1985). The supreme court may wish to re-evaluate its position in an appropriate case. It has granted a hearing on *Lerchenstein*. While the

distinction between a rule of inclusion and one of exclusion may appear merely semantic, it is significant because we currently view A.R.E. 404(b) as substantially curtailing the discretion that trial courts would otherwise have under A.R.E. 403, in determining whether to admit other crimes evidence.

within one of the exceptions to the rule of exclusion, and that it is not disguised propensity evidence. *Harvey v. State*, 604 P.2d 586, 589 (Alaska 1979); *Freeman v. State*, 486 P.2d 967, 977 (Alaska 1971).

In this case, Moor testified that he frequently wrestled with A.F. and C.W., and that if he touched their breasts, it was accidental and not sexually motivated. Moor's testimony, arguably, justified introduction of C.W.'s charges to disprove accident or mistake. A.R.E. 404(b). Had such evidence come in only on rebuttal, its admission would have been clearly within the trial court's discretion. The evidence came in, however, as part of the state's case-in-chief, prior to the time that Moor and his witnesses had testified. Under the circumstances, we have no way of knowing for certain whether the defense would have presented their case differently had the trial court not initially admitted the evidence. Under these circumstances, we conclude that Moor's testimony, standing alone, does not resolve the issue.

The state contends that the evidence was properly admitted to rebut C.W.'s testimony that A.F. frequently made up stories about sexual matters, and that C.W. did not believe A.F.'s claim that Moor had molested her. C.W.'s claims against Moor do not directly impeach or rebut her contentions regarding A.F.'s storytelling. However, it is marginally relevant to rebut her contention that she did not believe A.F.'s claim of molestation. We recognize that C.W. was substantially impeached by her own prior inconsistent statements regarding her observation of Moor's actions with A.F. Both Neyhart, the social worker, and Dome, the trooper testified, and apparently Eberhart the school nurse was prepared to testify, to these prior inconsistent statements. Furthermore, on cross-examination of G.W. and L.W., the state was able to show bias as a basis for arguing that C.W.'s parents had put pressure on her to change her story regarding her observations of Moor and A.F. In addition, without separate objection by Moor, the trial court permitted Neyhart to testify at length regarding C.W.'s complaints to her.

While the case is close, we conclude that the trial court did not err in permitting either the cross-examination of C.W. or the contradiction of her testimony by extrinsic evidence that she herself had previously claimed that Moor had sexually molested her.

A.F. testified that Moor digitally penetrated her. Moor testified that he did not. Virtually everyone who was in the company of Moor and the girls on the date in question was a member of Moor's family who had a substantial interest in protecting him. Besides his own testimony, Moor relied heavily on the testimony of G.W. and L.W., C.W.'s parents, regarding both girls' demeanor after the alleged events occurred. Virtually the only evidence corroborating A.F. was C.W.'s alleged statements to Neyhart and Dome that she had observed Moor's hand inside A.F.'s waistband on the day in question, and on other occasions had observed facts strongly corroborating A.F.'s testimony that Moor had sexually molested her by touching her breast. C.W., however, repudiated these statements at trial and testified that Neyhart and Dome had not understood that C.W. was repeating statements made to her by A.F. (statements which C.W. did not believe to be true). Thus, they mistakenly believed these were statements of C.W.'s own observations.

Under the circumstances, the primary controversy between the parties turned on C.W.'s credibility, and particularly on whether the statements she allegedly made to Neyhart were true or whether the statements she made in court were true. In this context, it would be artificial to contend that the jury could properly evaluate C.W.'s credibility and resolve the conflict between her in-court and out-of-court statements without considering C.W.'s contemporaneous claims that she herself had been sexually abused in virtually identical circumstances.

 It must be remembered: (1) that C.W., not A.F., was overheard in the supermarket claiming sexual molestation, and (2)

that C.W., not A.F., was first interviewed by the school nurse regarding sexual molestation. It is also important to stress that C.W.'s parents testified on Moor's behalf. A jury, in evaluating their credibility, should certainly know that C.W. accused Moor of sexually molesting her and then withdrew the charges after talking to her parents. Under the circumstances, C.W.'s recantation of her own charges is more significant than her withdrawal of support for A.F., in establishing C.W.'s parents' possible bias. Pressuring C.W. to withdraw her own charges, if the jury believed it occurred, is far more significant in this regard than pressuring her to repudiate A.F.'s statements. We stress that other crimes evidence should not be admitted in anticipation of a defense. It should wait until the defense is in fact presented to the jury. There is nothing in this record, however, that suggests that Moor would not have testified or presented the defense he did had C.W.'s testimony been restricted to A.F.'s complaints and C.W.'s observations regarding A.F. and Moor.

■ Moor also argues on appeal that the trial court erred in failing to grant his motion to compel a psychiatric evaluation of A.F., the complaining witness. The trial court expressed some doubt regarding its discretion to order such examination. The court clearly had such discretion. *Braham v. State*, 571 P.2d 631, 640 (Alaska 1977), *cert. denied*, 436 U.S. 910, 98 S.Ct. 2246, 56 L.Ed.2d 410 (1978); *Pickens v. State*, 675 P.2d 665, 668 (Alaska App.1984).

■ The court must consider competing values when the defense requests that a prosecution witness be examined by a psychiatrist. On the one hand, the court must consider the consequential invasion of the witness' privacy and the risk that crimes will go unreported if witnesses are subjected to harassment. On the other hand, the court must consider that the defendant has

the right to a fair trial and a reasonable opportunity to challenge the credibility and veracity of those who appear as witnesses against him. Therefore, in order to reconcile those competing interests, a strong showing of materiality is required before we will reverse a trial court's decision not to grant a psychiatric evaluation of a prosecution witness. *Pickens v. State*, 675 P.2d at 668–70.

■ In the instant case, Moor's offer of proof merely showed that A.F. had discussed, perhaps imaginary, sexual activities with her friends and that she had previously been counseled by a psychologist in connection with her parents' divorce. The trial court properly held that this evidence was insufficient to require a psychiatric examination of A.F. We note that C.W. was permitted to testify on cross-examination, without objection, that A.F. had once pretended to cry while making a false assertion that a male contemporary had sexually abused her, and on another occasion, had claimed to have had sexual activity with another male contemporary, who subsequently denied any such activity to C.W. Had Moor renewed his motion for an evaluation at this time, a more difficult case might have been presented. It was not renewed, however, and given the state of the record, we do not find an abuse of discretion in the trial court's earlier ruling.[6]

■ Next, Moor argues that the trial court erred in excluding cross-examination of A.F. regarding her prior allegations of sexual misconduct with others. In *Covington v. State*, 703 P.2d 436, 441–42 (Alaska App.1985), we held that a defendant seeking to use such evidence must obtain advance permission from the trial court out of the presence of the jury and justify such inquiry by evidence that the prosecuting witness' prior allegations were false. Moor concedes that he had no evidence of falsity at the time the trial court denied his appli-

---

6. In partial support of his motion to have A.F. examined by a psychiatrist, Moor asked to have the trial court review A.F.'s psychiatric records *in camera* to determine whether anything in those records would justify a current psycholog-

ical examination. The trial court denied this motion, and Moor does not renew the claim on appeal. *See Spencer v. State*, 642 P.2d 1371, 1375–76 (Alaska App.1982).

cation. As previously indicated, C.W. later testified on redirect examination, without objection, that A.F. had admitted to making one false claim of sexual abuse against a contemporary. She had also accused another contemporary who denied her allegation. Moor did not renew his application at this time. The jury heard C.W.'s testimony without objection. We find no reversible error.

Moor also argues that the trial court erred in allowing the state to elicit testimony from a social worker concerning statistics indicating that "99%" of all sexual misconduct reports are true. Julie Neyhart, a social worker with the Division·of Family and Youth Services, testified for the state. She was asked about her training:

Q: [Prosecutor] When did you attend the workshop at the Harbor View Medical Center in Seattle?

A: [Neyhart] I believe it was in January of 1980.

Q: Without going into a lot of detail, basically what did that involve?

A: That involved information about the dynamics of child sexual assault, about the myths surrounding it. The children—one of the myths, for example is that children fantasize sexual assaults or that they lie about them, and, in actual experience, at least at the Harbor View Facility, I believe it's 99% of all of the children are telling the truth. That the child, as a victim, is put into a difficult position simply because they are a child and they are used to trying to please adults, and it is very difficult for them to do something that would be contrary to pleasing an adult. We talked about some of the—

[Defense Counsel]: Excuse me, Your Honor. Could I ask that the witness confine her answers to the questions that are asked and not to ramble on in a dissertation about her profession?

[Prosecutor]: I believe the answer is responsive to the question—

Moor's counsel then "objected" on relevance grounds. No motion to strike was made. The court denied the objection.

██ Moor argues, for the first time on appeal, that Neyhart's statement was not supported by a sufficient foundation. Because this argument was not made to the trial court we need not consider it on appeal unless Moor establishes plain error. *Dyer v. State*, 666 P.2d 438 (Alaska App. 1983). We find no plain error. The comment was made in passing, and it did not clearly relate to the testimony of the complaining witness in this case; nor does it appear that either party relied upon it in argument. The error, if any, was therefore neither sufficiently obvious, nor sufficiently prejudicial to warrant relief in the absence of a proper objection. *Cf. State v. Keen*, 309 N.C. 158, 305 S.E.2d 535 (1983) (criticizing such evidence); *State v. Padilla*, 74 Or.App. 676, 704 P.2d 524, 525 (1985) (an expert may not testify that a witness is telling the truth but may state that a witness has the ability to perceive, remember, or relate).

██ Finally, Moor argues that the superior court erred in refusing to instruct the jury that an intent to gratify sexual desire was a necessary element of former AS 11.41.440 (sexual penetration with a minor) and former AS 11.51.130 (sexual contact with a minor). In *Flink v. State*, 683 P.2d 725 (Alaska App.1984), and *J.E.C. v. State*, 681 P.2d 1358 (Alaska App.1984), we held that sexual intent was a necessary element in statutes which forbade "sexual contact"[7] with children. Moor was convicted of two counts of contributing to the delinquency of a minor, a class A misdemeanor, in violation of former AS 11.51.130(a)(4), based in part upon A.F.'s testimony that he impermissibly touched her breasts. Moor defended in part by testifying that if he did touch her breasts, it was done unintentionally in the course of wrestling and roughhousing with her. Consequently, these two counts must be reversed. *Flink v. State*, 683 P.2d 725 (Alaska App.1984). Given the theory of the defense, error in failing to

7. *See* AS 11.81.900(b)(52)(A); former AS 11.41.- 900(b)(51).

properly instruct the jury could not be deemed harmless. *J.E.C. v. State,* 681 P.2d 1358 (Alaska App.1984). If this case is retried, the jury should be instructed that Moor must have had a sexual motive in touching A.F.'s breast in order to be guilty of contributing to the delinquency of a minor. Former AS 11.51.130.

■ Next, we consider whether the rule in *Flink* should be extended to cases of sexual penetration. When the charges against the defendant involve genital intercourse, fellatio, or cunnilingus, the conduct is sufficiently unequivocal to establish sexual motive. Thus, no separate instruction on sexual motive or intent is necessary. When, however, the charges involve digital penetration or penetration by object, an instruction requiring a finding of sexual motive or intent might be necessary to avoid penalizing innocent conduct. Moor is charged with digitally penetrating A.F. The defense, however, is that the incident never occurred, and that it was merely Moor's handing money to A.F. that may have led others to believe that his hands were in the vicinity of her waist. Under the circumstances, it would not appear that a separate instruction on sexual intent was necessary to avoid penalizing innocent conduct. This was not a case involving a doctor examining a patient or a parent bathing an infant child. Given the relationship between Moor and A.F., it is not possible that he could have innocently, but inadvertently, penetrated her vagina.[8]

The judgment of the superior court is AFFIRMED in part as to the violation of AS 11.41.440(a)(1) and REVERSED in part as to the two counts of violation of former AS 11.51.130(a)(4).

---

**8.** We note that, under former law, rape was a "general intent" crime. *See Walker v. State,* 652 P.2d 88, 91 (Alaska 1982). Moor has not cited any authority from this state or from other jurisdictions which support the proposition that digital penetration must be committed intentionally. We have previously recognized that our legislature based the Alaska statutes governing sexual assault on the law of Michigan.

*Reynolds v. State,* 664 P.2d 621, 625 (Alaska App.1983). Michigan courts have interpreted statutes similar to AS 11.41.440(a)(1) to not require a finding that digital penetration was sexually motivated. *See generally People v. Anderson,* 111 Mich.App. 671, 314 N.W.2d 723 (1982) (nonconsensual digital penetration of an adult is sexual assault regardless of the assailant's motive or intent).