Alva W. PERATROVICH, Sr., Appellant,

v.

STATE of Alaska, Appellee.

No. A–5356.

Court of Appeals of Aláska.

Oct. 6, 1995.

James W. McGowan, Sitka, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

Alva W. Peratrovich, Sr., appeals his conviction for third-degree sexual abuse of a minor (sexual contact with a minor between the ages of 13 and 15), AS 11.41.438(a)(1). He also appeals two provisions of his sentence. We affirm Peratrovich's conviction, but we remand this case to the superior court for reconsideration of Peratrovich's sentence.

During her sixth-grade year, V.J.'s parents (who lived in Craig) sent her to live with her grandmother and stepgrandfather, Clara and Alva Peratrovich, Sr., so that she could attend school in Klawock. V.J. was 11 and 12 years old during that school year. V.J. testified that Alva Peratrovich often entered her room at night. V.J. would awaken to find Peratrovich sitting on her bed, touching her genitals and her breasts. V.J. testified that she "would push him away, but he wouldn't go. I'd tell him to stop, and he wouldn't. There was nothing I could do; he was bigger than me. I couldn't do anything."

In the fall of 1988, around the time V.J. began eighth grade, her mother informed her that her grandmother had been diagnosed with breast cancer. V.J. no longer lived at her grandparents' house, but often spent time there after school. One afternoon after school, V.J. was in the back room of the Peratrovich home, watching television. Peratrovich entered the room and informed V.J. of her grandmother's breast cancer. V.J. told Peratrovich that she was already aware of her grandmother's illness. At this point, Peratrovich insisted on "showing" V.J. where her grandmother's tumors were by touching V.J.'s breasts. According to V.J.'s testimony, Peratrovich

> kept trying to show me ... where [the doctors] thought the lumps were going to be, and I kept telling him that I already knew, ... and he just decided to show me anyway. ... He started feeling my breasts, and pushing on them, and ... showing me where her lumps were.

V.J. became angry and began to yell, whereupon Peratrovich stopped touching her. It was this incident that formed the basis of Peratrovich's conviction for third-degree sexual abuse of a minor. (Peratrovich was originally also indicted for the sexual touching that occurred during V.J.'s sixth-grade year, but this charge was dismissed after the superior court ruled that the charge was barred by the statute of limitations.)

### Admissibility of Evidence of Peratrovich's Prior Sexual Abuse of V.J.

Before his trial, Peratrovich asked the superior court to prohibit the State from introducing evidence of Peratrovich's sexual abuse of V.J. during her sixth-grade year. Superior Court Judge Michael A. Thompson ruled that this evidence was admissible under Alaska Evidence Rule 404(b)(2). Peratrovich questions this ruling on appeal.

In the version in effect at the time of Peratrovich's trial, Evidence Rule 404(b)(2) declared that, in a prosecution for either physical or sexual abuse of a minor,

> evidence of other acts by the defendant toward the same or another child is admissible to show a common scheme or plan if admission of the evidence is not precluded by another rule of evidence and if the prior offenses
>
> (i) are not too remote in time;
>
> (ii) are similar to the offense charged; and
>
> (iii) were committed upon persons similar to the prosecuting witness.

Peratrovich argues that his sexual abuse of V.J. during her sixth-grade year was "too remote in time" because it occurred two years before the act charged in the indictment. Peratrovich also argues that his acts of touching V.J.'s genitals and breasts were not "similar to the offense charged" because they occurred at night, because they involved genital touching, and because they occurred in a different year.

■ Peratrovich's argument is meritless. First, we are unpersuaded by Peratrovich's purported distinctions between his 1988 sexual abuse of V.J. and his 1986 sexual abuse of V.J.. Second, Peratrovich's suggested construction of Evidence Rule 404(b) would run completely counter to the legislature's intention when it enacted this rule.

The current version of Evidence Rule 404(b) exists because the legislature wished to make it easier for the prosecution to introduce evidence of a defendant's other acts of sexual or physical abuse. *See* the House Judiciary Committee's Letter of Intent accompanying Sec. 9, ch. 66 SLA 1988, found in the 1988 House Journal, p. 2332. But even before Evidence Rule 404(b) was amended by the legislature, the evidence challenged in this case would have been admissible. In *Burke v. State,* 624 P.2d 1240, 1249 (Alaska 1980), the supreme court recognized a "lewd disposition" exception to former Rule 404(b). The holding in *Burke* was described by this court in *Moor v. State,* 709 P.2d 498, 506 (Alaska App.1985):

> In *Burke,* the supreme court considered a sexual offense exception to the general rule excluding evidence of other crimes or wrongful acts[.] Under this exception, such evidence was admissible to show "lewd disposition." The court decided that, where the prior alleged acts are all with the same victim, evidence of those acts is admissible.

The challenged evidence in this case is of sexual abuse that Peratrovich perpetrated upon the same victim. It was therefore admissible under *Burke* even before the legislature amended Rule 404(b). Since the legislature's declared purpose in amending the rule was to expand the scope of admissibility, we must reject Peratrovich's contention that his other acts of sexual abuse committed upon V.J. were inadmissible under the amended version of Rule 404(b) even though they would have been admissible under the former version of the rule.

### Whether the Statutory Definition of "Sexual Contact" is Unconstitutionally Vague

Peratrovich next raises a constitutional challenge to his conviction. At trial, Peratrovich's basic defense was that the sexual contact had not occurred—that V.J. was not telling the truth. However, as an alternative position, Peratrovich contended that if he touched V.J.'s breasts, it was not for any sexual purpose but only in fulfillment of his role as V.J.'s caretaker, trying to explain her grandmother's illness.

The definition of "sexual contact" contains an exception for touchings "that may reasonably be construed to be normal caretaker responsibilities for a child, interactions with a child, or affection for a child". *See* AS 11.81.900(b)(53)(B)(i). The jury was instructed on this exception. By returning its guilty verdict, the jury in Peratrovich's case impliedly found, beyond a reasonable doubt, that Peratrovich's touching of V.J.'s breasts could not reasonably be construed as part of normal caretaker responsibilities.

■ On appeal, Peratrovich argues that the meaning of the phrase "normal caretaker responsibilities" is unconstitutionally vague. He contends that the word "normal" fails to specify a reasonably ascertainable standard of conduct because people will have different definitions of what is normal. Peratrovich relies on *Bykofsky v. Borough of Middletown,* 401 F.Supp. 1242 (M.D.Pa.1975), in which the court struck down an ordinance that established a nighttime curfew for minors unless the minor had obtained a permit from the mayor for "normal or necessary nighttime activities". *Id.* at 1247. The federal court held that the ordinance was unconstitutionally vague because the use of the word "normal" placed unfettered discretion in the hands of the mayor. *Id.* at 1250.

However, the question is not what "normal" might mean in the abstract. The word must be interpreted in context. For example, even though the *Bykofsky* court decided that the phrase "normal ... nighttime activities" was too vague, the court upheld the constitutionality of other curfew provisions dealing with "normal travel" along "normal routes". Thus, to decide the constitutionality of Alaska's definition of "sexual contact", we must examine the meaning of the phrase "normal caretaker responsibilities" in the context of a statutory scheme that generally forbids sexual contact with minors.

Because "normal caretaker responsibilities" are an exception to the general definition of "sexual contact", any question concerning the scope of "normal caretaker responsibilities" arises only if the jury first finds, beyond a reasonable doubt, that the defendant knowingly touched the minor's

genitals, anus, or female breast. After the State proves the elements of sexual contact, then the exception for "normal caretaker responsibilities" operates as a "defense" (as defined in AS 11.81.900(b)(15)) to the crime. As stated in the legislative commentary to the definition of "sexual contact":

> The legislature intends that the exceptions listed in revised AS 11.81.900(b)[ (53) ](B) ... shall *not* be part of the prosecution's pleading and proof in its case in chief. Rather, these exceptions must be raised by the defendant. If raised, the prosecution bears the burden of disproving the exception beyond a reasonable doubt. The legislature intends that the exceptions operate as other defenses provided for in the criminal code. See AS 11.81.900(b)(15).

1984 Senate Journal, p. 3388 (emphasis in original).

■ If the State proves that the defendant engaged in sexual contact with a minor, and if the defendant asserts the defense of "normal caretaker responsibilities", the statute directs the jurors to decide whether the defendant's act *"may reasonably be construed to be normal caretaker responsibilities"*. (Emphasis added.) In other words, the jurors are not asked to decide whether they personally feel that the defendant's act was part of "normal caretaker responsibilities", but rather whether the defendant's acts might be construed as normal caretaking by a reasonable person. The defendant is to be acquitted unless the jurors conclude that no reasonable person would construe the defendant's act as normal caretaking.

Measuring the defendant's actions against what a reasonable person would deem necessary or proper in a given situation is a familiar legal standard. It is used, for example, to evaluate claims of self-defense and necessity. See AS 11.81.330(a); AS 11.81.320 and *Cleveland v. Anchorage*, 631 P.2d 1073, 1078–79 (Alaska 1981). By incorporating a standard of reasonableness, our law necessarily accepts the consequent fact that the lawfulness of a defendant's actions may not be capable of precise assessment in advance. As Justice Holmes said in *Nash v. United States*, 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232 (1913):

> [T]he law is full of instances where a man's fate depends on his estimating rightly [—] that is, as the jury subsequently estimates it [—] some matter of degree.... [For example,] [a]n act causing death may be murder, manslaughter, or misadventure, according to the degree of danger attending it by common experience in the circumstances known to the actor.

Thus, some degree of imprecision inevitably attends the use of a "reasonableness" standard.

■ When a statute is challenged as unconstitutionally vague, one important consideration is whether the definition is worded as explicitly as possible to achieve the legislative purposes. *United States v. Petrillo*, 332 U.S. 1, 6–7, 67 S.Ct. 1538, 1541, 91 L.Ed. 1877, 1882 (1947). The Constitution does not require impossible exactitude. As noted by Justice Frankfurter, dissenting in *Winters v. New York*, 333 U.S. 507, 524–25, 68 S.Ct. 665, 674, 92 L.Ed. 840 (1948),

> [W]hether [a statute's] notice is or is not "fair" depends upon the subject matter to which it relates. Unlike the abstract stuff of mathematics, or the quantitatively ascertainable elements of much of natural science, legislation is ... concerned with the multiform psychological complexities of individual and social conduct.

Or, as stated more recently by Justice Marshall in *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), lawmakers are "[c]ondemned to the use of words", and for this reason courts can not expect statutes to display "mathematical certainty". The Constitution does not require "meticulous specificity" in the wording of statutes; rather, statutory language can incorporate "flexibility and reasonable breadth". 408 U.S. at 110, 92 S.Ct. at 2300.

For example, in *Grayned* the Supreme Court upheld an ordinance forbidding people from making any noise or diversion that "disturbs or tends to disturb the peace or good order" of a school session or class. *Id.*, 408

U.S. at 107–08, 92 S.Ct. at 2298. The Court concluded:

> [I]t is apparent from the statute's announced purpose that the measure [of criminality] is whether normal school activity has been or is about to be disrupted. We do not have here a vague, general "breach of the peace" ordinance, but a statute written specifically for the school context, where the prohibited disturbances are easily measured by their impact on the normal activities of the school. Given this "particular context," the ordinance gives "fair notice to those to whom [it] is directed."

*Grayned,* 408 U.S. at 112, 92 S.Ct. at 2301 (quoting *American Communications Assn. v. Douds,* 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925 (1950)).

The "particular context" in Peratrovich's case is a statutory scheme that regulates (and generally prohibits) sexual contact with minors. In AS 11.81.900(b)(53)(B), the Alaska Legislature declared that even when the State proves that the defendant knowingly engaged in sexual contact with a minor, this contact will not be criminal if the contact might reasonably be construed as part of normal caretaker responsibilities.

The problem facing the drafters of this statutory language was that there is a range of situations in which sexual contact with a minor might reasonably be construed as justified. As this court recognized in *Van Meter v. State,* 743 P.2d 385, 391 (Alaska App. 1987), "the legislature ... responded to the problem of differentiating between a wide variety of innocent touchings" when it enacted the exceptions listed in AS 11.81.900(b)(53)(B). It is difficult to perceive how the legislature might have been more precise in describing the types of sexual contact that adults should be allowed to have with minors.

Peratrovich suggests that an alternative solution to the problem would be to return to former law, when "sexual contact" required proof of the defendant's intent to obtain sexual gratification. *See Flink v. State,* 683 P.2d 725 (Alaska App.1984). However, such a statute would not achieve the same legislative purposes as current AS 11.81.900(b)(53).

The disturbing truth is that some criminal defendants will try to justify a wide variety of exploitative, degrading, or violent sexual activity with minors by claiming that the activity was intended as a form of sex education or other "normal ... interaction with a child", and not as a way to obtain sexual gratification. For example, in *S.B. v. State,* 706 P.2d 695 (Alaska App.1985), the defendant engaged in multiple acts of sexual penetration and contact with his seven-year-old daughter. A psychologist who evaluated the defendant declared that it was quite possible that the defendant had no conscious sexual motivation for these acts:

> [I]t is possible that Mr. B. acted out of a set of sexual feelings with respect to his daughter that he was not consciously aware of and is presently denying. It is ... also possible that Mr. B. [subjectively believed] that he could provide [sexual education] to his daughter and actually did not believe himself to be sexually molesting her as he demonstrated sexual functioning to her.

*S.B.,* 706 P.2d at 697. See also *Potts v. State,* 712 P.2d 385, 387 (Alaska App.1985), in which the defendant claimed that his acts of sexual contact with his nine-year-old daughter "were intended only to satisfy [the daughter's] natural curiosity about sex" and were "educational in nature".

Because, depending upon the psychology of the offender, it may be impossible to prove beyond a reasonable doubt that the defendant's acts of sexual abuse were motivated by a conscious intent to obtain sexual arousal or gratification, the American Bar Association's National Legal Resource Center for Child Advocacy and Protection recommended that child sexual abuse statutes be drafted as general intent crimes with exceptions for particular types of sexual touching. In Recommendation 1.6 of its Recommendations for Improving Legal Intervention in IntraFamily Child Sexual Abuse Cases (1982), the National Resource Center advocated a statute much like Alaska's:

> The following acts should constitute sexual abuse of a child:
>
> . . . .
>
> (4) the intentional touching of the genitals or intimate parts (including the

breasts, genital area, groin, inner thighs, and buttocks) or the clothing covering them, of either the child or the perpetrator, EXCEPT that, it shall not include:

(a) acts which may reasonably be construed to be normal caretaker responsibilities, interactions with, or affection for a child; or

(b) acts intended for a valid medical purpose[.]

*Id.* at 13–14. The commentary to this proposal states, in relevant part:

It ... was decided that for acts involving sexual touching [Section (4) ], the intent or purpose of the touching would not be included [as an element of the crime]. One reason for this choice is that the motivation for committing sex offenses varies widely and may encompass some purpose which would not be stated. Further, it was felt that a more logical method was to include language as to what contact should be exempted from inclusion in the definition. The reasoning is that prosecutors should not have to prove as an element of the crime the perpetrator's intent or purpose when he sexually touches a child. Thus, language often used in statutes such as "for the purpose of sexual arousal or gratification," or other similar purpose is not included as an essential element of the crime.

Some reform statutes have dealt with the above problem by stating that the touching must be intentional, and "for the purpose of sexual arousal or gratification." [Alternatively], some statutes use language that the touching must be "reasonably construed as being for the purpose of sexual arousal or gratification." One court's interpretation of the latter terminology is that it be "read as a substantial lessening of the prosecutor's burden of proof; the touching must be intentional but the actor's purpose need not be proven to the jury. On the contrary, the jury may find that the actor's actual purpose was other than sexual gratification, e.g., anger [or] revenge, but still find that sexual contact had taken place." Indeed, one court stated that such language is included in the statute "in order to exclude from its cover-

age affectionate caresses of a child." Since this appears to be the legislative intent in using "for the purpose of" language, it was felt that a better approach is to specifically state the exclusion, and place the burden on the defendants to prove that the acts did not have a sexual purpose.

*Id.* at 15–16 (footnotes omitted). (Quoted in *Flink v. State,* 683 P.2d at 731–32.)

In *Flink,* this court ruled that Alaska's prior definition of "sexual contact" impliedly contained the requirement that the defendant act with the specific intent of achieving sexual arousal or gratification. 683 P.2d at 733. Alaska's current definition of "sexual contact" represents the legislature's response to *Flink:*

In passing [current AS 11.81.900(b)(53) ], the legislature intends to change the result reached by the Alaska Court of Appeals in *Flink v. State* [.] In the *Flink* case, the court ruled that the legislature intended that crimes involving sexual contact be specific intent crimes.... In adopting [this new definition of "sexual contact"], the legislature intends to reaffirm that crimes involving sexual contact and penetration are general intent crimes.

1984 Senate Journal, pp. 3387–88.

While the legislative commentary does not explicitly refer to the ABA National Resource Center's recommendations, the language of AS 11.81.900(b)(53)(B) appears to be based on the ABA's proposed statute. In particular, we note that the wording of the statutory exception for acts of sexual contact that "may reasonably be construed to be normal caretaker responsibilities" for a child, or "interactions with" a child, or "affection for a child" is taken directly from the ABA recommendations—thus indicating that the Alaska Legislature shared the ABA's concerns about the potential problems of a "specific intent" formulation.

From the foregoing discussion, it is clear that the legislature has a legitimate interest in prohibiting certain types of sexual contact with minors even when it can not be proved that the defendant acted with the conscious intent of achieving sexual arousal or gratification. The wording of current AS

11.81.900(b)(53)—that is, a general definition of the prohibited contact, accompanied by a list of the categories of sexual contact that are permitted—is a reasoned response to the definitional problem confronting the legislature. We note, moreover, that if a jury has a reasonable doubt as to whether a defendant's conduct fits within one of the exceptions, the defendant is to be acquitted. *See* AS 11.81.900(b)(15). For these reasons, we uphold the constitutionality of the definition of "sexual contact"—and, specifically, the portion of the definition that exempts sexual contacts that "[might] reasonably be construed to be normal caretaker responsibilities".

*See Matter of Appeal in Maricopa County,* 143 Ariz. 178, 692 P.2d 1027, 1034–35 (App. 1984) (upholding the constitutionality of the phrase "parental responsibilities" in a child welfare statute); *In re Aschauer's Welfare,* 93 Wash.2d 689, 611 P.2d 1245, 1249–1250 (1980) (holding that the phrases "proper parental control" and "proper maintenance, training and education", when evaluated in the entire context of Washington's child welfare laws, were not unconstitutionally vague); *In the Interest of Brooks,* 228 Kan. 541, 618 P.2d 814, 817–820 (1980) (upholding the constitutionality of "unfit" in a statute allowing termination of parental rights). *See also State v. Mills,* 52 Or.App. 777, 629 P.2d 861 (1981) (upholding the constitutionality of the phrase "leaves the child unattended ... for such period of time as may be likely to endanger the health or welfare of such child" in the Oregon child neglect statute).

 We additionally note that, even if there are difficult cases at the outer limits of what might reasonably be construed to be "normal caretaker responsibilities", Peratrovich's conduct falls within the core of the conduct prohibited by the sexual abuse of a minor statutes. *See Holton v. State,* 602 P.2d 1228, 1236–37 (Alaska 1979). Peratrovich claims that it was his "responsibility" as a "caretaker" to touch his teenage stepgranddaughter's breast, against her will, to illustrate where the girl's grandmother's tumors might be. This claim is implausible on its face.

We therefore reject Peratrovich's attack on the statutory definition of "sexual contact", and we uphold his conviction for third-degree sexual abuse of a minor. We now turn to Peratrovich's attacks on his sentence.

*Sentencing Issues*

At sentencing, Judge Thompson noted that Peratrovich's victim was "dreadfully disturbed" over the sexual abuse. When the judge announced the sentence, he ordered Peratrovich to "pay [any] counseling costs of the victim ... to the extent that she expends monies for counseling" up to a maximum of $5000. On appeal, Peratrovich argues that Judge Thompson failed to inquire into Peratrovich's ability to pay this amount of money.

 We see a more fundamental problem with the restitution order. Under AS 12.55.045(a), a sentencing court may order the defendant to pay "restitution to the victim or ... to a public, private, or private nonprofit organization that has provided or is or will be providing counseling ... services to the victim". It seems apparent that, under this statute, a defendant may be required to compensate the victim for future counseling expenses. Nevertheless, this court has repeatedly held that a restitution order must be based on substantial evidence of monetary loss or expense, not mere speculation. *Noffsinger v. State,* 850 P.2d 647, 650 (Alaska App.1993); *Harris v. State,* 678 P.2d 397, 408 (Alaska App.1984), *rev'd on other grounds sub nom., Stephan v. State,* 711 P.2d 1156 (Alaska 1985).

More particularly, in *Lawrence v. State,* 764 P.2d 318, 322 (Alaska App.1988), this court disapproved an award for future counseling expenses that was made in the absence of evidence firmly establishing the need for and the amount of such expenses. Compare *Reece v. State,* 881 P.2d 1135, 1138 (Alaska App.1994), where this court upheld an order requiring the defendant to make restitution for future counseling when the need for counseling and the cost of counseling were adequately established in the sentencing record.

 In Peratrovich's case, despite Judge Thompson's surmise that the victim might need counseling, the sentencing record con-

tains no evidence that the victim will undergo counseling, nor does it contain any evidence concerning the duration or cost of such counseling. We therefore conclude that the present record does not support the restitution order, and we vacate that portion of the sentence. We remand this issue to the superior court. If, on remand, there is evidence that more firmly establishes (1) that the victim will seek counseling, and (2) the expected cost of such counseling, then Judge Thompson may wish to revisit the issue of restitution.

As an additional condition of Peratrovich's sentence, Judge Thompson ordered Peratrovich not to return to Prince of Wales Island (the site of the offense):

> I'll order that, during the period of probation, you not return to Prince of Wales. I sort of hate to do that; I hate to exile you from there. But if you think about this realistically, I don't think you want to go back over there right now anyway. It would not be good for anybody in this case, and I think it would be masochistic for you to attempt to return there at this point. Maybe five years from now, maybe things will be different. But [for] right now, stay away from there.

The written judgement does not faithfully incorporate Judge Thompson's oral order. Rather, according to the written judgement, Peratrovich may return to Prince of Wales Island if he obtains the written permission of his probation officer. The record does not disclose whether this variance is a clerical error or instead manifests Judge Thompson's decision to alter his original order.

As noted above, Peratrovich's home is in Klawock. However, at the time of the sentencing hearing Peratrovich and his wife were living in Ketchikan so that Mrs. Peratrovich could be closer to medical facilities.

■ Judge Thompson forthrightly categorized his order as Peratrovich's "exile" from Prince of Wales Island. Because this condition of probation bars Peratrovich from returning to his residence in Klawock, it affects Peratrovich's basic rights of property, travel, and association. Before Judge Thompson could forbid Peratrovich from returning to his home, the judge was obligated to affirma-

tively consider and have good reason for rejecting lesser restrictions (such as forbidding Peratrovich to be in the company of minors without independent adult supervision). *See Dawson v. State,* 894 P.2d 672, 680–81 (Alaska App.1995) (a probation condition denying defendant any unsupervised association with his wife was unduly restrictive of his liberty). We therefore vacate this condition of Peratrovich's probation and remand this issue to Judge Thompson for his reconsideration.

*Conclusion*

Peratrovich's conviction for third-degree sexual abuse of a minor is AFFIRMED. The two challenged provisions of his sentence are VACATED; this case is REMANDED to the superior court so that the court can reconsider the restitution order and the probation condition barring Peratrovich from returning to Prince of Wales Island.